# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     Debtors. [1] | PROMESA<br><br>Title III<br><br>Case No. 17-BK-3283 (LTS)<br><br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     and<br><br>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA),<br><br>     Plaintiffs,<br>v.<br><br>PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>     Defendant | Adv. Pro. No. 18-00149 |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

and

PBA FUNDS, ASSURED, AND QTCB
NOTEHOLDER GROUP

Defendant-Intervenors.

**PBA FUNDS', ASSURED'S, AND QTCB NOTEHOLDER GROUP'S RULE 12(C)
MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .............................................................................................................. 5

    A.    The PBA is an Independent, Public Sector Landlord. ........................... 5

    B.    The PBA Leases Support the Payment of the PBA's Substantial Operating
and Financing Expenses................................................................................. 7

    C.    All Relevant Parties have Treated the PBA Leases as True Leases, And
Continue to Do So.......................................................................................... 9

    D.    The Commencement of the Title III Cases Did Not Modify the Debtors'
Obligations under the Leases. ...................................................................... 11

    E.    Procedural Background and the Allegations of the Complaint. .......................... 14

STANDARD OF REVIEW ............................................................................................ 16

ARGUMENT ................................................................................................................. 17

I.      THE PBA LEASES ARE VALID LEASES UNDER COMMONWEALTH AND
FEDERAL LAW, AND NEITHER THE COMPLAINT'S ALLEGATIONS NOR
THE LEASES ATTACHED THERETO COMPEL A DIFFERENT
CONCLUSION............................................................................................................ 17

    A.    The Leases are Valid Pursuant to Substantive Commonwealth Law. ................. 18

    B.    Plaintiffs Have Failed to Allege that Tenants Can Acquire Ownership of
Premises Leased from the PBA—the Hallmark of a Financing under
Federal Law. ................................................................................................ 20

    C.    The Complaint Should Be Dismissed Consistent with Precedent Holding
That the PBA Is Independent from the Commonwealth.................................... 22

    D.    Because the PBA Enabling Act Mandates that the PBA Leases Be Net of
Maintenance Costs and Payments on the Bonds, Plaintiffs Cannot
Plausibly Allege that These Provisions Are Evidence of a Disguised
Financing...................................................................................................... 28

II.    BECAUSE THE LEASES CANNOT BE SEVERED, COUNTS I AND II
SHOULD BE DISMISSED AS A MATTER OF LAW. ................................................. 29

III.   PLAINTIFF UCC LACKS ARTICLE III STANDING TO PURSUE THE
RELIEF REQUESTED BY THE COMPLAINT. .......................................................... 32

CONCLUSION.............................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)................................................................................16

*In re Associated Nursing, Inc.,*
   Case No. 99-24876-DWH, 2012 WL 6552854 (Bankr. N.D. Miss. Dec. 14,
   2012) ................................................................................................28

*Autoridad de Edificios Pubs. v. Corp. del Centro Cardiovascular de P.R. y el
   Caribe,*
   Civil Case No. KCD2009-3278 (Aug. 25, 2009)....................................10

*Bank of N.Y. v. United Air Lines, Inc.,*
   No. 04 C 2838, 2005 WL 670528 (N.D. Ill. Feb. 16, 2005), *aff'd* 146 F. App'x
   836 (7th Cir. 2005)................................................................................28

*Brankle Brokerage and Leasing v. Volvo Fin. Servs. (In re Brankle Brokerage
   and Leasing, Inc.),*
   394 B.R. 906 (Bankr. N.D. Ind. 2008) ...............................................9, 20

*In re Buffets Holdings,*
   387 B.R. 115 (Bankr. D. Del. 2008) .......................................................31

*Butner v. United States,*
   440 U.S. 48 (1979)................................................................................31

*Casiano v. Borintex Mfg. Corp.,*
   133 D.P.R. 127, 134 (P.R. 1993) ............................................................31

*Cruz v. Puerto Rico,*
   558 F. Supp. 2d 165 (D.P.R. 2007)........................................................15

*Curran v. Cousins,*
   509 F.3d 36 (1st Cir.2007).....................................................................16

*In re Daben Corp.,*
   469 F. Supp. 135 (D.P.R. 1979)..............................................................18

*DeMayo v. Nugent,*
   517 F.3d 11 (1st Cir. 2008)....................................................................19

*Fernandez Rodriguez v. Autoridad De Edificios Publicos,*
   No. ISCI201301583, 2016 WL 8456760 (P.R. Cir. Dec. 14, 2016)..................24, 27

TABLE OF CONTENTS
(continued)

*Freeman v. Town of Hudson*,
    714 F.3d 29 (1st Cir.2013) ...................................................................................19

*Giant Eagle, Inc. v. Phar-Mor, Inc.*,
    528 F.3d 455 (6th Cir. 2008) ...............................................................................20

*Int'l Trade Admin. v. Rensselaer Poly. Inst.*,
    936 F.2d 744 (2d. Cir. 1991).........................................................................21, 28

*In re Integrated Health Servs., Inc.*,
    260 B.R. 71 (Bankr. D. Del. 2001) ......................................................................28

*Iravedra v. Public Building Authority*,
    196 F. Supp. 2d 116 (D.P.R. 2002)................................................................24, 25

*Iravedra v. Public Building Authority*,
    Case No. 01-1581 (DRD) (July 30, 2001) *(The Commonwealth of Puerto
    Rico's Mot. to Dismiss and Br. in Supp. Thereof)* .......................................... *passim*

*Kando v. Rhode Island State Bd. of Elections*,
    880 F.3d 53 (1st Cir. 2018)...................................................................................19

*In re KAR Dev. Assocs.*,
    180 B.R. 597 (Bankr. D. Kan. 1994) ....................................................................20

*U.S. ex. rel. Kelly v. Novartis Pharma. Corp.*,
    827 F.3d 5 (1st Cir. 2016)..............................................................................16, 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................................................32

*Maldonado v. Cruz Davila*,
    161 D.P.R. 1, 21–22 (P.R. 2004) .........................................................................31

*McCrillis v. Aut. Navieras de P.R.*,
    123 D.P.R. 113 (P.R. 1941) ...........................................................................29, 31

*Mitchell v. Maurer*,
    293 U.S. 237 (1934)..............................................................................................34

*NEPSK, Inc. v. Town of Houlton*,
    283 F.3d 1 (1st Cir.2002) .....................................................................................16

*Nieves Angulo v. Policia de P.R*,
    No. KDP2007-0343, 2014 WL 2437868 (P.R. Cir. Apr. 30, 2014) .......................24

TABLE OF CONTENTS
(continued)

**Page**

*In re OMNE Partners II,*
  67 B.R. 793 (Bankr. D.N.H. 1986) .......................................................................17

*In re PCH Assocs.,*
  804 F.2d 193 (2d Cir. 1986)............................................................................17, 20

*Perez–Acevedo v. Rivero–Cubano,*
  520 F.3d 26 (1st Cir.2008) ......................................................................................16

*In re Pollock,*
  139 B.R. 938 (B.A.P. 9th Cir. 1992) .....................................................................31

*Rodriguez Torres v. Pub. Bldg. Auth.,*
  141 D.P.R. 362, 369-70 (P.R. 1996) ...................................................................9, 24

*Rossy v. del Valle Zeno,*
  34 P.R. Dec. 726 (P.R. 1925) ...............................................................................18

*Soto-Padro v. Pub. Bldg. Auth.,*
  747 F. Supp. 2d 319 (D.P.R. 2010), *aff'd sub nom. Soto-Padro v. Pub. Bldgs.
  Auth.,* 675 F.3d 1 (1st Cir. 2012) ...........................................................24, 25, 26, 27

*Soto-Padro v. Pub. Bldgs. Auth.,*
  675 F.3d 1 (1st Cir. 2012)......................................................................................27

*Spokeo, Inc. v. Robins,*
  136 S.Ct. 1540 (2016)........................................................................................32, 34

*St. Paul Fire & Marine Ins. Co. v. PepsiCo.,*
  884 F.2d 688 (2d Cir. 1989).................................................................................33

*In re Stone & Webster,*
  253 F.Supp.2d 102 (D.Mass.2003) .......................................................................16

*Trans–Spec Truck Service, Inc. v. Caterpillar Inc.,*
  524 F.3d 315 321–322 (1st Cir.2008) ...................................................................16

*In re Uni-Rty Corp.,*
  175 F.3d 1008, 1999 WL 177273 (2d Cir. 1999) ................................................17

*United Air Lines, Inc. v. HSBC Bank USA (In re United Air Lines, Inc.),*
  453 F.3d 463 (7th Cir. 2006)....................................................................21, 29, 30, 31

*United Air Lines, Inc. v. U.S. Bank N.A. (In re United Air Lines, Inc.),*
  447 F.3d 504 (7th Cir. 2006)............................................................................20, 30

-iv-

TABLE OF CONTENTS
(continued)

Page

*United Airlines v. HSBC Bank USA, N.A.*,
416 F.3d 609 (9th Cir. 2005) .......................................................................20, 30

*Valley Forge Christian College v. ASCSI*,
454 U.S. 464 (1982) .............................................................................................33

*Watterson v. Page*,
987 F.2d 1 (1st Cir.1993) ....................................................................................16

*Williams v. Branker*,
462 F. App'x 348 (4th Cir. 2012) ......................................................................19

**Statutes**

22 L.P.R.A. § 901, et seq. ............................................................................................6

31 L.P.R.A. § 3473, n. 1 ............................................................................................31

31 L.P.R.A. § 4012 ....................................................................................................17

31 L.P.R.A. § 4052 ......................................................................................................8

31 L.P.R.A. § 4053 ....................................................................................................18

31 L.P.R.A. § 4058 .............................................................................................18, 21

11 U.S.C. § 365(d)(3) ....................................................................................13, 14, 33

22 L.P.R.A. § 902 ..................................................................................................6, 24

22 L.P.R.A. § 906 ........................................................................................................6

22 L.P.R.A. § 907a ......................................................................................................8

22 L.P.R.A. § 916 ...............................................................................................8, 9, 28

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 365.02 (16th ed. 2018) .............................................17

3 COLLIER ON BANKRUPTCY ¶ 365.03 (16th ed. 2018) .............................................29

Federal Rules of Civil Procedure Rule 9(b).......................................................3, 16

Federal Rules of Civil Procedure Rule 12(c) .............................................................1

The PBA Funds,[2] Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. ("AGM," and together with AGC, "Assured") and the QTCB Noteholder Group,[3] (together with Assured and the PBA Funds, "Defendant-Intervenors," or "Movants," as applicable), as Defendant-Intervenors in this adversary proceeding (the "Adversary Proceeding"), move this Court, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (the "Rules"), made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure and section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2170, *et seq.*, for entry of an order substantially in the form attached as **Exhibit A** hereto.  In support of this motion (the "Motion"), Defendant-Intervenors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      For more than half a century, all relevant parties have treated the Public Buildings Authority (the "PBA") as a genuine landlord and its Leases (defined herein) as *bona fide*.  Those Leases have led to the construction of actual buildings, inhabited by real tenants, and have provided jobs and public services to countless Puerto Rico residents.

2.      At no point in the last 60 years of the PBA's existence, and even when the Commonwealth endeavored to delay paying the PBA what it was owed, did the Commonwealth once dispute that rent was due or allege that the Leases were invalid.  It was only **after** the commencement of the Title III Cases, when the PBA Funds—holders of bonds issued by the PBA—took steps to ensure that these amounts were actually paid to the PBA that Plaintiffs concocted a theory suggesting that the Leases were somehow something other than "true."

---

[2] *See Third Supplemental Verified Statement of the PBA Funds Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Case No. 17-3283-LTS, Dkt. No. 4855].  This Motion is being submitted solely on behalf of Candlewood Investment Group, Fir Tree Partners, First Pacific Advisors, Silver Point Capital L.P., Mason Capital Management, VR Global Partners, L.P, Assured, and the QTCB Noteholder Group.

[3] *See Second Supplemental Verified Statement of the QTCB Noteholder Group Pursuant to Bankruptcy Rule 2019* [Case No. 17-3283-LTS, Dkt. No. 4871].

1

3.      Now, Plaintiffs seek declarations that the PBA's Leases of real property are in reality "disguised financing" transactions, that no post-petition rent is due, and that the PBA is not entitled to administrative expense claims for that rent, despite the fact that the Debtors continue to occupy and benefit from the leased premises.  Based on the facts plausibly alleged, Plaintiffs are not entitled to the relief requested as a matter of law, and Defendants are entitled to judgment on the pleadings.  The Complaint[4] fails for at least three reasons:

4.      *First*, Plaintiffs do not allege that the tenants under the Leases build equity in or otherwise gain title to the leased premises—indeed, none of the exemplar Leases Plaintiffs chose to attach to the Complaint confers even an indicia of ownership to the tenants.  Because such an ownership interest is the quintessential characteristic of a secured financing, the difference between a lease and a mortgage under Commonwealth law, the failure to plead its existence here dooms the Complaint.

5.      Plaintiffs attempt to side-step this fatal shortcoming by arguing (but failing to plausibly allege facts showing) that the PBA is a sham or "alter ego" of the Commonwealth that does not really "own" its property at all, because it and the Commonwealth are one and the same, under "common control."   Plaintiffs have made the same allegation in another proceeding to support the argument that the PBA Bonds are, in reality, direct obligations of the Commonwealth that should be included in the calculation of the constitutional debt limit, all in service of a quixotic effort to repudiate over $6 billion of validly-issued, constitutionally-senior debt.[5]

---

[4] *See* Dkt. No. 1.

[5] *See Omnibus Objection of (i) Financial Oversight and Management Board, Acting Through its Special Claims Committee, and (ii) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* at ¶ 65 [Case No. 17-03283-LTS, Dkt. No. 4784] (the "GO Claims Objection").

6.    In substance, even if not in name, these are bold—but hollow—accusations of fraud against the PBA that, to even be taken seriously, must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.  But being all bark and no bite, Plaintiffs' Complaint does not even come close to the required level of detail.  For example, Plaintiffs would need to allege facts that explain the particulars of how the Commonwealth, its advisors, the Governor, and the PBA's directors and officers have been committing securities fraud for the last sixty years by issuing bonds after having withheld material information about how the PBA is a sham spanning more than half a century.

7.    Plaintiffs do no such thing.  To the contrary, Plaintiffs concede that the very PBA Leases they challenge here were entered into pursuant to the terms of the Legislative Assembly's mandate.  Through the Enabling Act, the Legislative Assembly authorized the PBA to enter into "lease contracts" for the "total or partial lease of any  . . .  physical facilities, buildings or developments belonging to and operating by" the PBA, and that the Leases "shall be valid and binding" on tenants and provide for "rents payable" to the PBA.  That the PBA has done nothing more than what it was required to do by the Legislative Assembly is dispositive on the issue of lease validity, lest Plaintiffs double down and accuse the Legislative Assembly as complicit in this supposed fraud.

8.    Further, the premise of Plaintiffs' argument that the PBA is a sham and mere alter ego of the Commonwealth has been expressly rejected no fewer than five times, including by the Puerto Rico Supreme Court and the U.S. Court of Appeals for the First Circuit.  As the Commonwealth itself has represented in prior litigation to Puerto Rico and federal courts alike, "the fact is that the 'PBA' is a public corporate entity apart from the Commonwealth with its own judicial persona," it is fiscally and administratively independent, and is "not an 'arm or alter

3

ego' of the Commonwealth . . ."[6]  This Court should join the unanimous chorus of other courts rejecting Plaintiffs' specious argument.

9.      But even accepting Plaintiffs' insinuations regarding the "common control" of the PBA and the Commonwealth as true (and notwithstanding the conclusions of numerous Commonwealth and federal courts to the contrary), Plaintiffs' theory that the PBA's "operations" are not those of a "landlord," Compl., ¶ 31, borders on the absurd when one considers the plurality of tenants under the Leases that are *not* a part of the Commonwealth's central government.  Is it really the case that these numerous municipalities, public corporations, and other independent entities—including United States federal government entities like the General Services Administration and the Department of Housing and Urban Development—do not have a landlord-tenant relationship with the PBA?  That the Complaint does not even acknowledge, let alone make a serious attempt to grapple with these fundamental issues reveals its frivolous nature.

10.     ***Second***, Plaintiffs do not challenge the provisions in the Leases providing for rental payments of operating expenses, which cover the PBA's maintenance, administrative, and capital expenses as landlord—including the salaries and benefits of the PBA's more than 1,000 employees.  Indeed, the Commonwealth is currently paying operating rent pursuant to a budget approved by the very same Oversight Board that denies the existence of such an obligation in this Adversary Proceeding.[7]  Rather, Plaintiffs challenge only the clauses of the Leases that dedicate rental payments to the PBA's debt service.  But because the Leases are integrated

---

[6] *See Iravedra v. Pub. Bldg. Auth.*, Case No. 01-1581 (DRD) (D.P.R. July 30, 2001) [Dkt. No. 12 at 4] *(The Commonwealth of Puerto Rico's Mot. to Dismiss and Br. in Supp. Thereof)*, a copy of which is attached hereto as **Exhibit E**; *see also Iravedra v. Pub. Bldg. Auth.*, Case No. 01-1581 (DRD) (D.P.R. September 28, 2001) [Dkt. No. 19 at ¶ 8] *(The Commonwealth of P.R.'s Mot. to Submit Reply)* (the "Iravedra Reply"), a copy of which is attached hereto as **Exhibit F**.

[7] *See generally* P.R. HOUSE OF REPS., Joint Resolution, 3rd Ordinary Sess. (Jun. 30, 2018).

contracts that cannot be severed under Commonwealth law, they may not be bifurcated into a "true" operating lease (*i.e.* operating expenses) giving rise to postpetition claims and a "disguised" financing component (*i.e.* debt service) that does not.  Plaintiffs' effort to create two separate Leases where there is only one cannot withstand scrutiny, and the Complaint should be dismissed on this ground alone.

11.    ***Finally***, Plaintiff UCC—which is not a tenant, landlord, or third-party beneficiary under the Leases—lacks Article III standing to pursue the Complaint.[8]   The UCC has no legitimate role in this dispute.  While the UCC has the burden to establish it meets each of the requirements of Article III standing, it has failed to allege even a single fact to carry that burden. As a result, it should be dismissed from this Adversary Proceeding.

12.    Even when viewed in the most generous of lights, the Complaint contains no plausible allegations that if true would entitle Plaintiffs to the relief they seek: recharacterization of the Leases and disallowance of claims.  The PBA's Leases, which have been treated as true leases for decades, were not magically converted into disguised financings simply because the Commonwealth filed for bankruptcy.  This Motion should be granted.

## BACKGROUND

### A.    The PBA is an Independent, Public Sector Landlord.

13.    In 1958, the Commonwealth created the PBA to construct, maintain, and operate public facilities—such as schools, courthouses, police, and fire stations—that enable the Commonwealth government to provide its citizens with essential public services.  *See* 22 L.P.R.A. § 901, et seq. (as amended, the "Enabling Act"); *see also* Compl., ¶ 1 (PBA's facilities

---

[8] As used herein, "UCC" refers to the Official Committee of Unsecured Creditors of All Title III Debtors (except for COFINA).

used to "provid[e] essential services to the public"); Oversight Bd. Obj., Case No. 17-03283-LTS, Dkt. No. 2587 (listing the PBA's duties and powers).

14.    In furtherance of these goals, the Commonwealth legislative assembly (the "Legislative Assembly") established the PBA as a public corporation—an independent entity that is separate from the Commonwealth government.  *See* Enabling Act § 902 (PBA constituted as a public "instrumentality" that is a "body corporate and politic with corporate franchise"); Compl., ¶ 21 ("instrumentalities" and "public corporations" are "not part of the Commonwealth's central government").[9]  The Legislative Assembly granted the PBA broad powers in the exercise of its mandate, including the capacity to sue and be sued, to enter into and execute contracts, the power of eminent domain, the power to acquire and dispose of property, and the authority to issue bonds to finance its activities.  *See* Enabling Act § 906.

15.    As envisioned by the Enabling Act, the PBA holds fee simple title to a substantial portion of the properties that it leases to tenants, and has acquired rights or easements sufficient to permit it to lease the remainder of the properties under its care.  *See* Enabling Act § 906; *see also* 1995 Resolution § 707.[10]  The PBA's property portfolio is vast, with recent audited financial statements disclosing $3.7 billion of capital assets.[11]  To provide the extensive administrative,

---

[9] Plaintiff Oversight Board admitted as much when advocating for the confirmation of the COFINA plan of adjustment.  *See Suppl. Br. of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amd. Plan of Adj. of P.R. Sales Tax Fin. Corp.*, Case No. 17-03283-LTS, Dkt. No. 4890, at 2-5 (enabling legislation determines corporate form of public entities) ("COFINA Plan Support Brief").

[10] *See* Puerto Rico Public Buildings Authority, Resolution No. 468, Authorizing and Securing Government Facilities Revenue Bonds Guaranteed by the Commonwealth of Puerto Rico, adopted June 22, 1995.  Copies of the PBA's bond resolutions are available at http://www.gdb.pr.gov/investors_resources/pr_public_building.html.

[11] *See* Public Buildings Authority, Basic Financial Statements for Fiscal Years Ended June 30, 2014 and 2013 and Independent Auditors' Report at 8, 15, available at http://www.gdb.pr.gov/investors_resources/documents/PBA BasicFS-6-30-2014.pdf.

maintenance, and operational services attendant to managing this large building portfolio, the PBA employs a workforce in excess of 1,000 employees.[12]

16.     The PBA's status as a public entity that is separate and apart from the Commonwealth, with its own judicial persona, and that is fiscally and administratively independent, has long been recognized by courts including the Supreme Court of Puerto Rico, the District Court for Puerto Rico, and the First Circuit.  Indeed, every court to have addressed this issue (and as recently as 2016) has discredited the idea that the PBA is the alter ego of the Commonwealth.  In their haste to bring litigation ahead of the now-cancelled mediation, Plaintiffs appear to have overlooked those decisions and simply rehash the same unsuccessful arguments that have been repeatedly rejected by prior court rulings deciding this very same issue. (*See infra* at pp. 18-22).

### B.     The PBA Leases Support the Payment of the PBA's Substantial Operating and Financing Expenses.

17.     Over the last sixty years, in its capacity as the single largest public sector landlord on the island, the PBA has entered into thousands of leases of its building space with the Commonwealth; the Commonwealth's departments, agencies, instrumentalities, and municipalities; the United States government; and private tenants (collectively, the "Leases"). *See* Compl., ¶ 22.  In addition to staffing and maintaining these buildings, the PBA is also responsible for their design, construction, and improvement.  It has largely financed these activities through the debt capital markets; currently, there are in excess of $4 billion of outstanding Revenue Refunding Bonds, Government Facilities Revenue Bonds, and Government

---

[12] *See* Gloria Ruiz Kuilan, *Edificios Públicos comienza la operación para remozar las escuelas*, EL NUEVO DÍA (Jun. 17, 2017), *available at* https://www.elnuevodia.com/noticias/locales/nota/edificiospublicos comienzalaoperacionpararemozarlasescuelas-2332034/.

Facilities Revenue Refunding Bonds issued by the PBA (collectively, the "Bonds," and the holders of Bonds, the "Bondholders").

18.     In return for the billions of dollars in financing it has raised over the last half century, the PBA pledged a portion of the rents that it receives from its tenants to service the Bonds.  *See* 1995 Bond Resolution § 703.  In addition to the rents collected by the PBA, the Bonds are backed by a guarantee of the Commonwealth's full faith and credit.  *See* Enabling Act § 907a.  As further security for the Bonds, Bondholders are named as express third-party beneficiaries of the Leases, allowing Bondholders to directly enforce the obligations of tenants to pay rent to the PBA.  *See, e.g.*, Compl., Exh. D, § 6.05.

19.     The Leases, of course, require that tenants pay rent.  *See* Compl., Exhs. A at 2; B at 2; C at 3; D at 3; *accord* 31 L.P.R.A. § 4052 (tenants are obligated to "pay the price of the lease in the manner agreed upon").  That rent is allocated towards two broad categories of expenditures: (a) the operating expenses incurred by the PBA in maintaining, administering, and leasing the buildings, including the payment of its workers' salaries and benefits and the funding of critical capital expenditures (such portion, "Operating Rentals"); and (b) the payment of principal and interest on the debt raised to finance the buildings (such portion of the rent, "Debt Service Rentals").  *See id.*  In order to ensure that the amounts collected by the PBA will always be sufficient for the PBA to repay the financing and operating expenses it has actually incurred, the Leases were structured as net leases, *i.e.*, the rent under the Leases is variable and reflects the PBA's actual expenses incurred as landlord.  *See* Enabling Act § 916.

C.   All Relevant Parties have Treated the PBA Leases as True Leases, And
     Continue to Do So.

20.     For nearly sixty years, all relevant parties (including the PBA, the
Commonwealth, and their respective representatives) have consistently treated the Leases as
contracts for the lease of real property by the PBA to its tenants.

21.     In the Enabling Act, the Legislative Assembly authorized the PBA to enter into
"*lease* contracts" for the "total or partial *lease* of any . . . physical facilities, buildings or
developments belonging to and operated by" the PBA.  Enabling Act § 916 (emphasis added).
The Leases "shall be valid and binding" on tenants, and will provide for "rents payable" to the
PBA.  *Id.*  The 1995 Resolution that authorized the issuance of the Bonds, which was adopted by
the PBA Board and executed by the Secretary of the PBA, similarly defines the PBA's "*Lease*
Agreements" as those "agreements entered into by the [PBA] with the *lessees* for the *rental* of
[PBA] Facilities."  1995 Resolution § 101 (emphasis added).  The Supreme Court of Puerto Rico
held that it was "unquestionable" that the PBA, as "*owner*" of its buildings, is dedicated to "the
*leasing* and administration of . . . buildings or structures that house the executive, legislative and
judicial machinery of the Commonwealth of Puerto Rico."  *Rodriguez Torres v. Pub. Bldgs.
Auth.*, 141 D.P.R. 362, 369-70 (P.R. 1996) (emphasis added).[13]

22.     The offering memoranda for the Bonds, which were also approved by the PBA
Board, executed by the PBA's Executive Director, and developed under the direction of the
Government Development Bank[14] disclose in great detail the PBA's operations, including its
entry into "*lease* agreements with various departments, agencies, instrumentalities and
municipalities of the Commonwealth in respect of *Leased* Facilities" and its collection of

---

[13] A certified translation is attached as **Exhibit B**.

[14] *See* Act No. 272 (May 15, 1945), as amended (requiring the Government Development Bank to act as financial
advisor in connection with the issuance of securities).

"[m]onthly *rental* payments."  *See, e.g.,* Official Statement for PBA Bonds, Series C and D (Jan. 11, 2002), at 10 (emphasis added).[15]  The independent auditors' report accompanying the offering documents for the Bonds lists one of the PBA's assets as "*rent* receivables" and notes that "[m]ost of the PBA's revenues are derived from space *leased* under *operating lease agreements* with governmental entities and other tenants."  *See id.*, Exh. 1 at 16 (emphasis added).

23.     The PBA's recent audited financial statements are also clear that the PBA's capital assets primarily consist of "buildings" owned by the PBA which "are *leased* to the Commonwealth's agencies and public corporations."  *See* Public Buildings Authority, *Basic Financial Statements and Other Supplementary Information for the Year Ended June 30, 2015, and Independent Auditors' Report* at 15 (emphasis added).[16]  The rental revenues received under the Leases are contrasted with "[f]unds for [the] construction of facilities for other governmental agencies," which represent funds "advanced by other governmental [agencies] . . . for the construction of *facilities that will be owned by these entities.*"  *Id.* at 19, 41 (emphasis added).

24.     When tenants have not paid rent in the past, the PBA has taken legal action to collect upon those defaults.[17]  Similarly, the Commonwealth Secretary of Justice has opined that the PBA could not be required to provide office space to a Commonwealth agency free of charge.  *See* Op. Sec. Jus. (Feb. 16, 1999).[18]

---

[15]  The official statements for each series of PBA Bonds are available at http://www.gdb.pr.gov/investors_resources/pr_public_building.html.

[16]  The PBA's audited financial statements are available at https://emma.msrb.org/ER1253592.pdf.

[17]  *See, e.g., Autoridad de Edificios Pubs. v. Oficina de Administración de los Tribunales*, Civil Case No. KCD2009-3277 (Jan. 15, 2010) (PBA suing Commonwealth Office of Court Administration for in excess of $42 million owed under Leases); *Autoridad de Edificios Pubs. v. Corp. del Centro Cardiovascular de P.R. y el Caribe*, Civil Case No. KCD2009-3278 (Aug. 25, 2009) (PBA suing Cardiovascular Center of Puerto Rico and the Caribbean for unpaid rent in excess of $47 million).

[18]  An official translation of the opinion is attached hereto as **Exhibit C**.

25.     The treatment of the Leases by PBA and the Debtors as true leases continued even after the commencement of the Title III Cases (defined herein).  Indeed, the first proof of claim filed in the Title III Cases was filed by the PBA against HTA, asserting a claim for more than $10 million in past-due "[r]ent."[19]  Plaintiff the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") previously filed motions seeking an extension of the period to assume or reject the Debtors' "Real Property Leases"—including those entered into with the "Puerto Rico Public Buildings Authority"—under Bankruptcy Code section 365(d)(4).  With the exception of a one-sentence boilerplate reservation of rights generally applicable to all of the Debtors' leases, those motions contained no suggestion that the Oversight Board thought that the Leases were anything but "true."  *See* Case No. 17-03283-LTS, Dkt. Nos. 705, 1518, 2494.

26.     Even to this day, in direct contrast to the allegations in the Complaint, the Oversight Board and the Commonwealth continue to treat the Leases as *bona fide* through the continued payment of a portion of the Operating Rentals due thereunder.  *See* P.R. HOUSE OF REPS., Joint Resolution, 3rd Ordinary Sess. (Jun. 30, 2018) (joint budget resolution for fiscal year 2019 developed and approved by the Oversight Board, and including line item appropriations "[f]or payment of *rent* to the Public Buildings Authority" for each Commonwealth tenant) (emphasis added).

**D.     The Commencement of the Title III Cases Did Not Modify the Debtors' Obligations under the Leases.**

27.     On April 6, 2016, the Commonwealth purported to enact a moratorium law (Act No. 21-2016, the "First Moratorium Law") that purported to authorize the Governor to declare states of emergency with respect to a number of Puerto Rico public entities, including the PBA, and to prohibit the payment of principal and interest with respect to the debt obligations of such

---

[19] *See* Case No. 17-03567-LTS (D.P.R. Jun. 1, 2017) [Claim No. 1].

public entities. On June 30, 2016, the President of the United States signed PROMESA into law.
Congress included in PROMESA a provision (PROMESA § 303(1)) specifically intended to
preempt the First Moratorium Law, and the First Moratorium Law was accordingly preempted
and void as of June 30, 2016. Also on June 30, 2016, the former Governor issued an executive
order pursuant to the First Moratorium Law purporting to suspend the obligation of the
"Commonwealth and its departments and agencies" to pay rent to the PBA under the Leases and
purporting to prohibit the PBA from paying principal and interest on the PBA Bonds. *See*
Admin. Bulletin No. OE-2016-30. The order also barred creditors (including the PBA and its
bondholders) affected by the order from commencing or continuing any proceedings to enforce
rights under the Leases. *Id.*

28. Because PROMESA preempted the First Moratorium Law, the then-Governor had
no statutory authority to issue the purported executive order, and the Governor's purported
executive order was preempted and void as of June 30, 2016 pursuant to PROMESA § 303(1).
Moreover, Congress included a provision in PROMESA, PROMESA § 303(3), that specifically
preempted unlawful executive orders, like Admin. Bulletin No. OE-2016-30, that modify the
rights of holders of the debts of a territorial instrumentality (such as the PBA) or that divert funds
from such a territorial instrumentality to the Commonwealth. Therefore, the executive order
purportedly issued with respect to the PBA on June 30, 2016, was also preempted and void
pursuant to PROMESA § 303(3). The Commonwealth has subsequently purported to enact
additional moratorium laws amending or superseding the First Moratorium Law, each of which
moratorium laws was preempted and void *ab initio* pursuant to PROMESA § 303(1). Moreover,
the Governor has purported to issue additional executive orders pursuant to such moratorium

12

laws, each of which subsequent executive orders was preempted and void *ab initio* pursuant to
PROMESA §§ 303(1) and (3).[20]

29.     Between May 3 and July 2, 2017, the Oversight Board filed voluntary petitions for
relief under Title III of PROMESA for the Debtors (collectively, the "<u>Title III Cases</u>").   The
filing of Title III petitions triggered the application of Bankruptcy Code section 365, which
requires that a debtor-lessee "timely perform all the obligations" arising under an "unexpired
lease of nonresidential real property."  *See* 11 U.S.C. § 365(d)(3).   In other words, since the
commencement of their respective Title III Cases in the summer of 2017, the Bankruptcy Code
has required each of the Debtors that leases property from the PBA to pay rent at the full rate
specified in each Lease.

30.     Subsequently, the PBA Funds filed the *Motion of the PBA Funds for the Payment
of Rent*, Case No. 17-3283-LTS (D.P.R. Feb. 13, 2018) [Dkt. No. 2492] (the "<u>Rent Motion</u>")
seeking, as express third-party beneficiaries of the Leases, to compel the Debtors to perform
under the terms of those Leases by paying the contractual rent on a current basis.   In the
alternative, the Rent Motion sought the entry of an order allowing an "administrative expense
claim" in favor of the PBA on account of such rent.  Consistent with black letter bankruptcy law,
this claim would continue to accrue until each Lease had been assumed or rejected by the
Debtors pursuant to Bankruptcy Code section 365.

31.     Plaintiffs objected to the Rent Motion, suggesting for the first time that the PBA's
tenants (such as the Commonwealth, its agencies, municipalities, instrumentalities, and other
entities) should be excused from paying for the space they occupy because the relevant Leases
were not truly leases at all, but rather part of a scheme to obtain disguised financing.  *See* Case

---

[20] In addition, each of the relevant moratorium laws and executive orders violated the Contracts and Takings Clauses
of the United States and Commonwealth Constitutions and as such is unlawful and void.

13

No. 17-03283-LTS, Dkt. Nos. 2586, 2587.  On March 7, 2018, the PBA Funds entered into a stipulation with Plaintiffs, whereby the PBA received an allowed administrative expense claim on account of all postpetition rents that would accrue through the date of assumption or rejection of each Lease, provided that Plaintiffs' rights (if any) to challenge the validity of the Leases were preserved.[21]  Nine months later, this Complaint followed.

> **E.   Procedural Background and the Allegations of the Complaint.**

32.    The core assertion of the Complaint, as Plaintiffs here have alleged more directly in the GO Claims Objection, is that the PBA's "operations" are not those of a "landlord," that the "PBA is a sham," and it did not enter into the Leases at arm's length.  Plaintiffs allege that the Leases' "sole purpose" is to provide a vehicle for the Commonwealth to repay the PBA bonds through the lessees' rent payments.  *See* Compl. ¶ 1. Ignoring the PBA's 60-year history, clear language in the Enabling Act authorizing the PBA to enter into leases, the existence of the PBA's more than 1,000 employees that provide services to tenants each day, precedent from the Supreme Court of Puerto Rico and the District Court unequivocally ruling that the PBA is a distinct legal entity, and the Leases themselves, the Complaint seeks a declaratory judgment that: (1) the Leases are not "true leases" giving rise to administrative expense claims under Bankruptcy Code section 365(d)(3), but are rather disguised financing transactions; (2) the PBA is not otherwise entitled to an administrative expense claim because it has not provided a benefit to the Debtors; and (3) the PBA does not hold administrative expense claims on account of the Commonwealth's guarantee obligations under Leases with non-Debtor entities.

33.    Because Plaintiffs did not name the PBA Funds as defendants in the Complaint—despite the fact that they are express third-party beneficiaries of the Leases, are necessary parties

---

[21] *See Order Resolving the Motion of the PBA Funds for the Payment of Rent*, Case No. 17-03283-LTS [Dkt. No. 2716].

required to be joined under Rule 19, and brought the Rent Motion in the first instance—the PBA
Funds were required to seek intervention in the Adversary Proceeding pursuant to Rule 24.
Accordingly, on January 18, 2019 the PBA Funds and the QTCB Noteholder Group filed
motions to intervene (the "Bondholder Intervention Motions"), *see* Dkt. Nos. 12, 14, on the basis
that, among other things, (a) the PBA Funds and the QTCB Noteholder Group, as express third-
party beneficiaries of the Leases, possess an unqualified right to intervene in the proceeding and
(b) the PBA (the only party named as a defendant in the Complaint) could not adequately protect
their interests.   On January 28, 2019, Assured filed a motion to intervene (together with the
Bondholder Intervention Motions, the "Intervention Motions"), *see* Dkt. No. 21, on the same
basis as the PBA Funds and the QTCB Noteholder Group.

34.     In compliance with Rule 24(c), the PBA Funds, the QTCB Noteholder Group, and
Assured attached pleadings (as opposed to a motion to dismiss) to the Intervention Motions in
the form of draft answers (as supplemented or amended, the "Answers") generally denying
Plaintiffs' allegations.   On March 12, 2019 the Court entered an order granting the Intervention
Motions, *see* Dkt. No. 54 (the "Intervention Order"), and on March 19, 2019 Assured, the QTCB
Noteholder Group, and the PBA Funds filed their Answers. *See* Dkt. Nos. 56, 58, 59.[22]

35.     By this Motion, Defendant-Intervenors now seek judgment on the pleadings with
respect to the counts in the Complaint seeking a declaration that the Leases are disguised
financings that do not give rise to administrative expense claims.   Even accepting all of the

---

[22] In accordance with the Intervention Order, the PBA Funds and the QTCB Noteholder Group each also filed
counterclaims against Plaintiffs.   *See* Dkt. Nos. 58, 59.   Pursuant to the Intervention Order, the counterclaims are
limited to those "directly related to the issues raised in the Complaint or PBA's Answer."   Because the
counterclaims raise issues directly related to the Complaint and / or PBA's Answer, Movants submit that the
pleadings are essentially closed for the purposes of this Motion.   In the event that the Court prefers to consider the
Motion after Plaintiffs have responded to the counterclaims, Movants respectfully request that the Court hold the
Motion in abeyance until the close of pleadings on the counterclaims.   Contemporaneously with this filing, Movants
have contacted counsel for Plaintiffs and the PBA to set a schedule for Plaintiffs' response to the counterclaims and
their opposition to the Motion.

plausible factual allegations in the Complaint as true, Plaintiffs have failed to show that they are entitled to such relief as a matter of law. Accordingly, Defendants are entitled to judgment on the pleadings.

## STANDARD OF REVIEW

36. "Federal Rule 12(c) allows a party to move for judgment on the pleadings at any time '[a]fter the pleadings are closed but [early enough] not to delay the trial.'" *Cruz v. Puerto Rico*, 558 F. Supp. 2d 165, 178 (D.P.R. 2007) (quoting Fed. R. Civ. P. 12(c)). A Rule 12(c) motion for judgment on the pleadings "is treated much like a Rule 12(b)(6) motion to dismiss." *Perez–Acevedo v. Rivero–Cubano*, 520 F.3d 26, 29 (1st Cir.2008). Filed after the close of the pleadings, a Rule 12(c) motion is "based solely on the factual allegations in the complaint and answer." *NEPSK, Inc. v. Town of Houlton,* 283 F.3d 1, 8 (1st Cir.2002).[23]

37. For purposes of this Motion, the Complaint's well-pleaded factual allegations are taken as true, but its legal conclusions, labels, and formulaic recitations of causes of actions' elements are not. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Where, as here, a complaint includes allegations of misrepresentation or fraud, to survive dismissal "Federal Rule of Civil Procedure 9(b) . . . requires that . . . a complaint must specify the time, place, and content of an alleged false representation. Conclusory allegations and references to 'plans and schemes' are not sufficient."

---

[23] In evaluating a Rule 12(c) motion, a court may also "consider 'documents the authenticity of which are not disputed by the parties'" as well as "'documents central to the plaintiffs' claim'" and "'documents sufficiently referred to in the complaint.'" *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007); *see also Trans–Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315 321–322 (1st Cir. 2008); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). When the documents submitted are part of the public record, however, the court may consider them without converting the motion to dismiss into a motion for summary judgment. *See In re Stone & Webster*, 253 F. Supp. 2d 102, 128 & n. 11 (D. Mass. 2003) (considering copies of SEC Form 4 filings without converting the motion to dismiss into a motion for summary judgment).

*U.S. ex. rel. Kelly v. Novartis Pharm. Corp.*, 827 F.3d 5, 13 (1st Cir. 2016) (citation and quotations omitted).

38.     Courts routinely grant judgment on the pleadings where, as here, the moving party "deserves judgment as a matter of law." *Curran*, 509 F.3d at 44 (*quoting Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)).

## ARGUMENT

## I.   THE PBA LEASES ARE VALID LEASES UNDER COMMONWEALTH AND FEDERAL LAW, AND NEITHER THE COMPLAINT'S ALLEGATIONS NOR THE LEASES ATTACHED THERETO COMPEL A DIFFERENT CONCLUSION.

39.     Lease recharacterization is an extraordinary remedy.[24]  The party challenging a lease carries the burden of "showing by clear and convincing evidence" that an otherwise valid lease contract nevertheless should not be treated as an "unexpired lease" within the meaning of Bankruptcy Code section 365.  *Chicoine v. OMNE Partners II (In re OMNE Partners II)*, 67 B.R. 793, 795 (Bankr. D.N.H. 1986).[25]  Plaintiffs fail to state a viable claim that the leases are invalid (*i.e.*, not "true leases") under either Commonwealth or Federal law, because they have not alleged that the tenants obtain title to the leased premises—the hallmark of a disguised financing.  Plaintiffs cannot make that allegation because it would be categorically false, nor can they demonstrate that any tenant remains in possession at the end of a Lease without paying rent because that too would be false.

---

[24]  *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 804 F.2d 193, 200 (2d Cir. 1986) (there is a "strong presumption" that leases are what they purport to be); *see also In re Uni-Rty Corp.*, Case No. 98-5032, 175 F.3d 1008, 1999 WL 177273, at *2 (2d Cir. Mar. 26, 1999) (same).

[25]  *See* 3 COLLIER ON BANKRUPTCY ¶ 365.02 (16th ed. 2018) ("The party contending that an agreement is not a lease has the burden of proof . . .").

**A.      The Leases are Valid Pursuant to Substantive Commonwealth Law.**

40.      Under the Puerto Rico Civil Code, a lease is defined as a contract between two parties whereby "one of the parties thereto binds himself to give to the other the enjoyment or use of a thing for a specified time and a fixed price." *See* 31 L.P.R.A. § 4012.  Commonwealth courts have explained that this means a lease must provide for: (1) the use or enjoyment of property by the lessee, (2) in exchange for a rent that is either a sum certain or readily ascertainable, for (3) a fixed term or a term that is variable depending upon the occurrence of specified events.  *See In re Daben Corp.*, 469 F. Supp. 135, 148 (D.P.R. 1979).[26]  Because Puerto Rico is a civil law jurisdiction, the substantive provisions of its Civil Code (and not common law) are dispositive.  *See Ortiz v. Levitt & Sons*, 101 D.P.R. 290, 1 P.R. Offic. Trans. 407, 415 (1973); *see also Marrero-Garcia v. Irizarry*, 33 F.3d 117, 122 (1st Cir. 1994) ("Because Puerto Rico is a civil law jurisdiction we [] look to its substantive law," notwithstanding result reached by "[a]pplying basic principles of contract law"); *cf. Carr v. P.R. Ports Auth.*, Case No. 10-1170-SEC, 2011 WL 1484158, n. 7 (D.P.R. Apr. 15, 2011) (contrasting results reached by the First Circuit applying common law principles of liability with those reached under civil law, which is controlling in Puerto Rico).

41.      The Leases here are "true leases" under the Civil Code: they provide for the (1) use and enjoyment of the PBA's buildings by the tenants, (2) in exchange for rent calculated pursuant to their terms, for (3) the length of time specified therein.[27]  The Complaint challenges only the third requirement by arguing "[u]pon information and belief" that the "Lessees will be able to continue occupying and using the properties following termination of the Leases" without

---

[26] *See also Rossy v. del Valle Zeno*, 34 P.R. Dec. 726, 731 (P.R. 1925), a certified translation of which is attached hereto as **Exhibt D**.

[27] *See* Compl., Exhs. A at 2; B at 2; C at 2–3; D at 2–3.

18

paying additional rent.  *See* Compl. ¶ 34.  But even the cherry-picked Leases attached to the Complaint (not to mention the Puerto Rico Civil Code) directly contradict this allegation.  *See, e.g.,* Compl., Exh. D, §§ 1.01, 4.01 (establishing term of lease and providing that tenant has "unconditional obligation" to pay rent); *cf. id.* at 11 (amendment renewing original lease term beyond initial expiration date); *see also* 31 L.P.R.A. § 4053 (landlord may rescind lease contract upon non-payment of rent by tenant); *id.*, § 4058 (tenant "must return the estate at the expiration of the lease" to the landlord in good condition).  Thus, although the Court must accept well-pleaded facts in Plaintiffs' favor, it must reject conclusory allegations that, as here, are unsupported or contradicted by the record before it.  *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006); *DeMayo v. Nugent*, 517 F.3d 11, 16 (1st Cir. 2008) (declining to accept conclusory allegation unsupported by the complaint and record evidence, which was "more akin to rank speculation than a reasonable inference.").[28]

42.    Plaintiffs have alleged no facts that would rebut the Leases' *prima facie* validity, and the Court need not entertain Plaintiffs' unfounded speculation or draw patently unreasonable inferences in their favor.  Simply put, the Leases are valid under the Civil Code, which is dispositive here.

---

[28] *See also Williams v. Branker*, 462 F. App'x 348, 352–53 (4th Cir. 2012) (Noting that "[the court] need not accept [] unwarranted inferences, unreasonable conclusions, or arguments."); *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018) (reasoning that in assessing a motion for judgment on the pleadings, a court is required to "separate wheat from chaff; that is, [to] separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)"); *Freeman v. Town of Hudson*, 714 F.3d 29, 39-40 (1st Cir. 2013) (concluding that the complaint's "failure to do more than conclusorily state that the [plaintiffs] were both similarly situated to and treated differently from unspecified 'other contractors' is insufficient to survive the defendants' motion to dismiss.")

**B.     Plaintiffs Have Failed to Allege that Tenants Can Acquire Ownership of Premises Leased from the PBA—the Hallmark of a Financing under Federal Law.**

43.     Even if federal lease jurisprudence were applicable here (and it is not), the Leases are equally valid as a matter of federal law.

44.     Federal courts have considered a number of factors to determine whether an otherwise valid lease is "truly" a lease for the purposes of the Bankruptcy Code, including: (1) whether the property reverts to the lessor at the end of the lease, or the lessee has the option to acquire it for nominal cost; (2) the relation between the rent and the fair market value of the property; (3) whether there is a balloon payment; (4) whether the lessee's obligations are unconditional; and (5) whether the lessor assumes the risks and obligations incidental to ownership of the property. *See, e.g., In re PCH Assocs.*, 804 F.2d at 200; *United Airlines v. HSBC Bank USA, N.A.*, 416 F.3d 609, 617 (7th Cir. 2005).

45.     Although the First Circuit has not yet addressed the issue, the first factor— whether the lessee has an option to purchase the property for nominal consideration or otherwise builds equity over the life of the lease—is a constant that is a necessary prerequisite for a finding that a lease is a disguised financing, and its absence is outcome-determinative. *See, e.g., Giant Eagle, Inc. v. Phar-Mor, Inc.*, 528 F.3d 455, 462, n. 9 (6th Cir. 2008) ("[I]n a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease.") (citations omitted); *United Air Lines, Inc. v. U.S. Bank N.A. (In re United Air Lines, Inc.)*, 447 F.3d 504, 509 (7th Cir. 2006) (no true lease where landlord had "no reversionary interest when the deal ends—much like a lender when a secured loan is paid off"); *Brankle Brokerage & Leasing v. Volvo Fin. Servs. (In re Brankle Brokerage & Leasing, Inc.)*, 394 B.R. 906, 913 (Bankr. N.D. Ind. 2008) ("A key, some would say pivotal, consideration . . . is whether the lessee acquires some type of ownership or equity interest in the property.") (citations

20

omitted); *In re KAR Dev. Assocs.*, 180 B.R. 597, 610-11 (Bankr. D. Kan. 1994) ("The mechanism for entitling [the tenant] to equity in the property is the option which allows [the tenant] to purchase the property for the sum of $100 plus the bond debt.  Furthermore, the economics of the transaction were such that everyone expected that [the tenant] would exercise the option and become the fee simple title holder.").[29]

46.     Plaintiffs have not alleged that the tenants will acquire title to the leased properties during or at the expiration of the Lease term.  Indeed, none of the four Leases Plaintiffs attached to the Complaint contains a purchase option or other equity interest for the tenant.  To the contrary, the PBA retains title to the properties throughout the life of the lease, and all residual rights revert to it at the expiration of the lease term.  *See* Compl., Exhs. A at 2; B at 2; C at 2; *cf.* 1995 Resolution §§ 705, 707, 708 (requiring the PBA to maintain clear title over its properties and generally restricting the PBA from transferring its property); *see also* 31 L.P.R.A. § 4058 (tenant must return leased property to landlord upon termination of lease).  Plaintiffs also ignore that when the Commonwealth wishes to use the PBA's services to construct and improve properties that the Commonwealth itself owns, it knows perfectly well how to do so—the PBA's audited financial statements reflect that the PBA holds funds for "construction of facilities for

---

[29] *See also* Ronald J. Silverman, et al., *Defining True Character: Implications of the Bankruptcy Code Amendments of 2005 on Lease Recharacterization*, 2006 ANN. SURV. OF BANKR. L. 6 (Sept. 2006) ("Underlying these tests is a basic inquiry—at the end of the lease term, did the parties expect that the lessor would retain in interest in the leased [property] that would have material value?"); *compare Martin Bros. Toolmakers v. Indus. Dev. Bd. of Huntsville (In re Martin Bros. Toolmakers, Inc.)*, 796 F.2d 1435, 1440 (11th Cir. 1986) (finding a true lease where the lessor retained ownership of property and the right of reentry upon default by the tenant) *with United Air Lines, Inc. v. HSBC Bank (In re United Airlines, Inc.)*, 416 F.3d 609, 617 (7th Cir. 2005) (holding a lease to be disguised financing because lessee's "full tenancy interest [would] revert[] to it for no additional charge"); *cf. United Air Lines, Inc. v. HSBC Bank USA (In re United Air Lines, Inc.)*, 453 F.3d 463, 465 (7th Cir. 2006) (a lessee must pay rent to remain in possession, whereas a "borrower . . . by contrast, may retain the property without paying the full agreed price"); *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 749 (2d. Cir. 1991) (where agreement provided for tenant to pay 99 years' worth of rent in first three years, agreement was not a lease, but rather a contract to acquire a "pre-paid right of possession").

other governmental agencies." In contrast to the buildings that the PBA leases, the "properties constructed through this arrangement *belong to the individual agencies and not to the [PBA]*."[30]

47.     As drafted, the Leases do not grant tenants any right to occupy or possess the leased property at any time following the Leases' termination, and at that time the tenants must instead vacate the premises—as required by the Puerto Rico Civil Code.[31] Any reasoned inquiry into the nature of the Leases should end here. To recharacterize the Leases as financing transactions—and to permit the Debtor-tenants to remain in occupancy rent-free thereafter— would not only do incredible violence to the plain language and economic substance of the Leases; it would confiscate the property of the PBA and redistribute it to the Commonwealth and other tenants.[32]

48.     In short, Plaintiffs have not alleged facts that establish a dispositive factor in the characterization of the Leases, and the counts seeking declaratory judgments that the Leases are disguised financings should therefore be dismissed as a matter of law.

### C.     The Complaint Should Be Dismissed Consistent with Precedent Holding That the PBA Is Independent from the Commonwealth.

49.     Rather than plausibly allege that tenants build an equity interest under the Leases, Plaintiffs instead insinuate that the PBA does not really "own" any property at all. In Plaintiffs'

---

[30] *See* Public Buildings Authority, *Basic Financial Statements and Other Supplementary Information for the Year Ended June 30, 2015, and Independent Auditors' Report* at 32 (emphasis added); *see also* Public Buildings Authority, *Basic Financial Statements and Other Supplementary Information for the Years Ended June 30, 2013 and 2012, and Independent Auditors' Report* at 37, *available at* https://emma.msrb.org/EP1024794.pdf.

[31] *See* 31 L.P.R.A. § 4058; *cf.* Case No. 17-03283-LTS, Dkt. No. 1518 (Plaintiff Oversight Board noting that the Debtors would be "required to evacuate thousands of buildings" upon termination of "Real Property Leases"— including those with the "Public Buildings Authority").

[32] Plaintiffs' argument that Bankruptcy Code section 929 or PROMESA section 311 compels a different result is a red herring. *See* Compl., ¶ 38. Despite Plaintiffs' characterization to the contrary, those provisions are merely "a rule of construction, and not a *per se* rule" that certain leases are in reality financing transactions. *See* 6 COLLIER ON BANKRUPTCY ¶ 929.03 (16th ed. 2018). More importantly, those provisions cannot be applicable to the Leases, which do not provide that rent is subject to appropriation—to the contrary, the obligation to pay rent under the Leases is, as Plaintiffs note, unconditional. *See* Compl., ¶¶ 29, 40.

view, the PBA is merely the "ostensible" owner of its property because the PBA and its tenants are all "under the common control of the Governor."  Compl., ¶ 34.  The Complaint omits factual allegations (let alone with the specificity required by Rule 9)[33] to support a charge that the PBA is a sham or alter ego, and skips to the unsupportable conclusion that the Leases are not "arm's length true lease agreements" but rather financing agreements entered into "between related parties that are ultimately controlled by the same person."  *Id.*, ¶ 32.  This is all in service of a spurious argument that the PBA's tenants "will be able to continue occupying and using the properties following termination of the Leases" without paying any further rent, which, of course, is asserted "[u]pon information and belief."  *Id*.

50.     This unsupported position is contradicted by an undisputed sixty years of practice by the PBA, the opinion of the Commonwealth Secretary of Justice, and the terms of the Leases themselves.[34]  It is also notable that this theory is entirely dependent upon the identity of the tenant: the PBA leases its properties to numerous entities that are not attached to the central Commonwealth government, including municipalities, public corporations, United States federal government entities, and private tenants.  The nature of the PBA's relationship with the Commonwealth government can have no bearing on the validity of Leases with those entities (including Leases with Debtors such as HTA).  Plaintiffs do not explain how a Lease can be a disguised financing with respect to one tenant, and a true lease with respect to another.  More importantly for the purposes of this Motion, Plaintiffs have alleged no facts suggesting that any of these entities are alter egos of the PBA or that the PBA otherwise provided them with financing under the guise of Leases.  Nor could they.

---

[33] *See Novartis Pharm. Corp.*, 827 F.3d at 13.

[34] *See, e.g., Autoridad de Edificios Pubs. v. Oficina de Administración de los Tribunales*, Civil Case No. KCD2009-3277 (Jan. 15, 2010); Op. Sec. Jus. (Feb. 16, 1999); Compl., Exh. C, § 4.01.

51.     Plaintiffs' argument also fails for an even more fundamental reason: *its core premise that the PBA lacks separate existence from, is an alter-ego of, and is entirely controlled by the Commonwealth has been flatly rejected no fewer than five times* by the District Court for Puerto Rico, the U.S. Court of Appeals for the First Circuit, and the Puerto Rico Supreme Court. Even more surprising, it is directly contrary to the position the Commonwealth itself has argued before—representing that the PBA is, indeed, fiscally and administratively independent.[35]   This Court should decline Plaintiffs' request to now hold otherwise.

52.     As Plaintiff Oversight Board has previously acknowledged, a public entity's corporate form and status vis-à-vis the Commonwealth is determined by the Legislative Assembly in the relevant enabling legislation.   *See* COFINA Plan Support Br. at 2-5.   The Enabling Act establishes the PBA as a "body corporate and politic" that is an "instrumentality" of the Commonwealth.   *See* Enabling Act § 902.   Because it is an "instrumentality" and "public corporation," the PBA is *not* "a part of the Commonwealth's central government," as Plaintiffs concede in the Complaint.   *See* Compl., ¶ 21.

53.     In light of this independence, courts in multiple jurisdictions have concluded (at the Commonwealth's urging) that the PBA "is not an alter ego of the [Commonwealth]."   *See Iravedra v. Pub. Bldg. Auth.*, 196 F. Supp. 2d 116 (D.P.R. 2002) (quotation omitted); *see also Soto-Padro v. Pub. Bldg. Auth.*, 747 F. Supp. 2d 319, 327 (D.P.R. 2010), *aff'd sub nom. Soto-Padro v. Pub. Bldgs. Auth.*, 675 F.3d 1 (1st Cir. 2012) (holding that the PBA had not demonstrated that it was an arm of the state entitled to immunity on Eleventh Amendment grounds, relying in part on the analysis in *Iravedra*); *Rodriguez Torres*, 141 D.P.R. 362 (PBA effectively operates as a private enterprise and therefore not entitled to governmental immunity

---

[35] *See* Iravedra Reply, ¶ 5b.

under workers' compensation statute); *Fernandez Rodriguez v. Autoridad De Edificios Publicos*, No. ISCI201301583, 2016 WL 8456760 (P.R. Cir. Dec. 14, 2016) (same); *Nieves Angulo v. Policia de P.R*, No. KDP2007-0343, 2014 WL 2437868 (P.R. Cir. Apr. 30, 2014) (same). The absurdity of Plaintiffs' alter ego theory was aptly summarized by the Puerto Rico Supreme Court, which observed that such a theory would amount to a conclusion that the "[Public Buildings] Authority is [the] employer of practically all the public employees and public officials of our country." *Rodriguez Torres*, 141 D.P.R. at 370 (quotations omitted).

54.    There is a clear consensus among both federal and Commonwealth courts that the PBA is separate and independent from the Commonwealth—no Court has ever held otherwise. In this respect, the reasoning employed by the Court in *Iravedra* and *Soto-Padro*—and the arguments made by the Commonwealth and the PBA in connection therewith—is particularly instructive. Both cases involved lawsuits commenced by employees of the PBA alleging unlawful discrimination by the PBA in violation of the United States Constitution and applicable federal law, and raised the question of whether the PBA and the Commonwealth were one and the same.

55.    In *Iravedra*, the Commonwealth sought to immunize itself from potential liability in a sexual harassment and national origin and gender discrimination lawsuit brought by a former PBA employee. The Commonwealth successfully argued that the PBA was *not* an alter ego of the Commonwealth (and therefore the Commonwealth was not liable for any unlawful acts committed by the PBA) and obtained dismissal on that basis. *Iravedra*, 196 F. Supp. 2d at 116. Like Plaintiffs do here, the *Iravedra* plaintiffs alleged that the PBA and the Commonwealth shared such an identity of interest that the liabilities of the former were in reality owed by the latter. The Commonwealth forcefully argued in response that, although the two entities were

25

closely affiliated, this did "not change[] the fact of the corporate nature of the PBA, its power to hire and appoint its own employees, its existence as an independent judicial persona, its fiscal and administrative independence and that its obligations will not tax the Commonwealth's credit," except in the circumscribed manner provided for in the Enabling Act.  Iravedra Reply, ¶ 5b.

56.     The District Court for Puerto Rico agreed.  Applying the test then employed by the First Circuit, the court found that although it performed "essential" and "traditional" governmental functions, the PBA had the status of a separate "public corporation" that exercised substantial autonomy over its internal operations.  *Iravedra*, 196 F. Supp. 2d at 107-109.   In doing so, the court explicitly rejected the theory proffered by Plaintiffs here that the PBA serves no useful function, emphasizing the sweeping powers and duties of the PBA:

> In sum, the powers of the PBA are all designed to bestow the administrative and fiscal independence that characterizes such corporate entities. The PBA has **complete control and supervision over each and every one of its properties and activities**. . . . [T]he PBA can enter into contracts in its own name; it can execute all instruments necessary or convenient to it; the PBA can acquire any kind of property and rights thereon, in any lawful manner, necessary or convenient to carry out the purposes of the Authority; [and] the PBA prepares or causes to be prepared, plans, projects and cost estimates for the construction, reconstruction, extension, improvements, enlargement or repair of any property or undertaking. . . .

*Id.* at 115 (emphasis in original, citations omitted).

57.     The court further found that, aside from the Governor's appointment of the Board, the Commonwealth otherwise had "no direct voice in the [PBA] Board's decisionmaking [sic]."

*Id.* at 112.  The court wrote:

> Plaintiff seems to be suggesting that because the [Board] members are political appointees of the Commonwealth, the Board and the Commonwealth are closely entangled. *Although this is an enticing argument, close scrutiny leads to the opposite conclusion.*

*Id.* (emphasis added).  The court found—as a matter of law—that the PBA was not an "alter ego" of the Commonwealth, and was therefore not entitled to Eleventh Amendment immunity. *Id.* at 115.

58.     In *Soto-Padro*, the PBA sought Eleventh Amendment immunity on the basis that it was an "arm of the state."  *Soto-Padro*, 747 F. Supp. 2d at 329.  Although the PBA conceded that the court had ruled in *Iravedra* eight years prior that the PBA was independent from the Commonwealth as a matter of law, it nonetheless argued that the *Iravedra* decision was outdated, due to the First Circuit's development of a new, two-part test to determine whether a particular entity qualifies as an arm of the state.[36]  That court also concluded that the PBA failed to demonstrate its status as an arm of the state, *id.*, which was upheld by the First Circuit on appeal.[37]

59.     There are no new facts alleged here that compel a different conclusion.  Each of the arguments Plaintiffs make has already been rejected as grounds for finding the PBA is an alter ego of the Commonwealth.  Furthermore, the most recent Lease supplied by Plaintiffs was entered into in December 2011, *see* Compl., Exh. B—a year before the First Circuit affirmed the holding in *Soto-Padro* that the PBA and the Commonwealth were separate legal entities, and a full five years before the Commonwealth appellate court's decision in *Fernandez Rodriguez*. Plaintiffs' allegation without substantiation that the validity of the Leases is undermined by the "common control" of the Commonwealth and the PBA does not improve with repetition; it remains the case that "close scrutiny leads to the opposite conclusion." *Iravedra*, 196 F. Supp. 2d at 112.

---

[36] *Id.* (*citing Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 69 (1st Cir. 2003)).

[37] *See Soto-Padro v. Pub. Bldgs. Auth.*, 675 F.3d at 1.

**D.    Because the PBA Enabling Act Mandates that the PBA Leases Be Net of
Maintenance Costs and Payments on the Bonds, Plaintiffs Cannot Plausibly
Allege that These Provisions Are Evidence of a Disguised Financing.**

60.     Plaintiffs also complain that the Leases are structured in a manner that permits the

PBA to "pass-through" its financing and operating expenses to its tenants in the form of Debt

Service Rentals and Operating Rentals, arguing that this is suggestive of something other than a

"true" lease.  *See* Compl., ¶ 31.  But Plaintiffs ignore that this is precisely what the Legislative

Assembly mandated the PBA to do in the Enabling Act:  "The rent payable to the [PBA] under

any [leases] shall be reasonable and sufficient, taking into consideration the amounts needed by

the [PBA] to (i) pay the interest, principal, and amortization requirements of the bonds issued by

the [PBA] for financing such a building . . . and (ii) to pay the operating and maintenance

expenses of such a building . . .".  Enabling Act § 916; *see also* 1995 Resolution § 701. As a

result, and a matter of law, the fact that the leases establish rent as net of maintenance costs and

payments on the bonds cannot plausibly be alleged as evidence that the lease are not true.  *See*

Compl., ¶ 31.

61.     But even if the Enabling Act did not require this lease structure, Plaintiffs' theory

would still fail.  These lease provisions that Plaintiffs rely on are in fact normal and customary

features in "net" lease structures.  In net leases, "the lessee pays all costs related to the premises

including the mortgage, taxes, and utilities."  *In re Integrated Health Servs., Inc.*, 260 B.R. 71,

77 (Bankr. D. Del. 2001).  The rent due from the tenant is thus "net" of these expenses, which

ensures that the landlord will not lose money under the lease.  *Id.*   And every court to have

considered the issue has held that the "superficial shifting of costs in a [] net lease, taken alone,

should not be interpreted to mean that an agreement is not a lease," recognizing that net leases are "common" in the commercial context. *Int'l Trade Admin*, 936 F.2d at 751.[38]

62.     Finally, this arrangement is actually beneficial to both the PBA *and* its tenants: the PBA is able to avoid incurring losses in months that operating expenses exceed projections, while tenants' rents are reduced in months that expenses are lower.  In any event, the fact that the Leases are structured in a manner beneficial to the PBA does not convert true leases into a disguised financing.  Accordingly, Counts I and II should be dismissed.

## II.     BECAUSE THE LEASES CANNOT BE SEVERED, COUNTS I AND II SHOULD BE DISMISSED AS A MATTER OF LAW.

63.     Where an agreement contains provisions that provide for the lease of real property—and where those provisions are not severable from the remainder of the agreement— the "agreement as a whole must be treated as a true lease for the purposes of § 365."  *In re United Air Lines, Inc.*, 453 F.3d 463, 471 (7th Cir. 2006); *cf.* 3 COLLIER ON BANKRUPTCY ¶ 365.03 (16th ed. 2018) (a lease must be assumed or rejected in its entirety "*cum onere*" unless it can be severed under state law).  In order to recharacterize the Leases Plaintiffs must first show that—as a matter of law—the Leases can be severed in order to cleave Debt Service Rentals from Operating Rentals.     The Complaint does not even attempt to do so.  Plaintiffs cannot contest the validity of the Operating Rentals—the Commonwealth *continues to pay a portion of those rentals on a current basis*, with the approval of Plaintiff Oversight Board.[39]   Because

---

[38] *See also, e.g., Bank of N.Y. v. United Air Lines, Inc.*, No. 04 C 2838, 2005 WL 670528, at *4 (N.D. Ill. Feb. 16, 2005), *aff'd* 146 F. App'x 836 (7th Cir. 2005) (same); *c.f. Associated Nursing, Inc. v. E.L. Garner (In re Associated Nursing, Inc.)*, Case No. 99-24876 (DWH), 2012 WL 6552854, at *8 (Bankr. N.D. Miss. Dec. 14, 2012) ("A 'triple net' lease is not necessarily an egregious tenancy relationship, nor is it prohibited by law.  As such, there is no legal or equitable authority that would permit this court to re-characterize this particular lease agreement as an option to purchase.").

[39] *See generally* P.R. HOUSE OF REPS., Joint Resolution, 3rd Ordinary Sess. (Jun. 30, 2018).

Plaintiffs challenge only the Debt Service Rental and make no attempt to challenge the Operating Rental portion of the Leases as a disguised financing, their claims fail as a matter of law.[40]

64.    The Operating Rental and Debt Service Rental are inseparable components of a single, integrated contract, and the Leases cannot be bifurcated into a "true" lease portion and a "disguised" financing portion.  *See United*, 453 F.3d at 467; *see generally McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113, 23 P.R. Offic. Trans. 109 (P.R. 1941) (discussing standards for severability under Commonwealth law).

65.    The Seventh Circuit's decision in the *United Air Lines* bankruptcy is illustrative. Faced with a lease agreement that provided for both (a) "ground rentals" intended to compensate a Denver airport for the airline's use and occupancy of terminal, freight, and hangar space, as well as (b) "facilities rentals" to repay the bonds used to finance improvements thereon, the Seventh Circuit held that the lease was not severable as a matter of law because plaintiff failed to show that "the language of the contract manifest[ed] each party's intent to treat the contract as divisible."  *United*, 453 F.3d at 465- 468 (citation omitted).

66.    The Seventh Circuit reasoned that the portion of the lease pertaining to the repayment of the bonds "could not have been a lone-standing bargain," because:

> Under no conceivable circumstances would [the airport] have given the proceeds of its bonds to United in this manner to develop airport facilities if United did not also have a leasehold at the new airport upon which to build and then operate those facilities.  By the same token, United is in the business of flying airplanes, not constructing airport facilities, and United would never have undertaken the bond-related obligations in this deal if it did not also have a leasehold upon which to operate at the new airport. *Simply stated, without a ground lease, there was no need for this particular bond arrangement*.

---

[40] Even if Plaintiffs could show that the Leases were severable, they would still have to demonstrate that the Debt Service Rentals provide the tenants with a disguised financing, which they of course do not, because the tenants still lack any ownership interest in the leased property.

*Id.* at 470 (emphasis added).[41]  Because the ground rental portion was "indisputably a lease," and the contract was not severable, the court held that United's integrated agreement with Denver was a true lease.  *Id.* at 467, 472.

67.     For the same reason, the PBA's Leases are not severable under Commonwealth law, and therefore must be recharacterized or upheld in their entirety.  State law governs the interpretation of contracts in bankruptcy, including the extent to which separate provisions in a contract are severable.[42]  The Supreme Court of Puerto Rico has explained that a contract should only be deemed severable in those instances where the agreement's "fundamental content is not affected by the void portion or, if affected incidentally, does not prevent the unaffected bargain from retaining its continued efficacy."  *McCrillis*, 123 D.P.R. at 135 (quotations omitted).  Commonwealth law—like the Colorado law applied by the Seventh Circuit in *United*—follows the "majority approach," analyzing whether the parties to a contract intended to remain bound by the surviving portion of a contract in the event that the other sections are rendered unenforceable.  *Id.* at 134–35.[43]

68.     In determining whether a contract is severable, Commonwealth courts also grant significant weight to whether the contract contains a "savings clause," *i.e.*, a contractual

---

[41]  The Seventh Circuit contrasted two companion cases involving *United*'s leases with California airports by pointing out that the entire agreement with the Denver airport was contained in one document.  In the other two *United* cases, *In re United Air Lines, Inc.*, 447 F.3d 504 (7th Cir. 2006) and *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609 (7th Cir. 2005), the Seventh Circuit held that United's leases with San Francisco and Los Angeles airports were disguised financing.  These cases were distinguished by the Seventh Circuit on the basis that, in the SFO and LAX cases, the tenants' obligations to pay ground rentals and debt service rentals were memorialized in separate agreements.  *In re United Air Lines, Inc.*, 453 F.3d 463, 467 (7th Cir. 2006).  Here, the tenants' obligations under each Lease are all contained in a single, integrated document.  *See, e.g,* Compl., Exh. A.

[42]  *See Butner v. United States*, 440 U.S. 48, 54–55 (1979); *United*, 453 F.3d at 467; *Moore v. Pollock (In re Pollock)*, 139 B.R. 938, 940 (B.A.P. 9th Cir. 1992); *cf. In re Buffets Holdings*, 387 B.R. 115, 124 (Bankr. D. Del. 2008) ("[T]here is no federal policy which requires severance of a lease condition solely because it makes a debtor's reorganization more feasible." (internal quotations omitted)).

[43]  *See also Maldonado v. Cruz Davila*, 161 D.P.R. 1, 21–22 (P.R. 2004); *Casiano v. Borintex Mfg. Corp.*, 133 D.P.R. 127, 134 (P.R. 1993).

provision for the survival of the contract if portions are found to be invalid.  *See McCrillis*, 123

D.P.R. at 136 & n.4.  Such savings clauses are taken as evidence of the intent of the parties to be

bound by the remainder of the contract in the event that certain covenants are unenforceable.  *Id.*

69.    As an initial matter, no savings clauses appear in any of the Leases reviewed by

Defendant-Intervenors or supplied by Plaintiffs.   Because those Leases were negotiated by

sophisticated entities, the absence of a savings clause is strong evidence that the parties did not

intend to be bound by discrete provisions of the Leases if others proved impossible or

unenforceable.[44]

70.    Further, to paraphrase the Seventh Circuit: under no conceivable circumstances

would the PBA have used the proceeds of the Bonds to construct and improve its facilities if

there were not tenants to lease those facilities from it.  By the same token, neither would the

PBA's tenants have undertaken the Debt Service Rentals in the Leases if not for the use and

occupancy of the buildings they received in exchange.  The Leases are integrated documents and

therefore may not be recharacterized as a matter of law.

## III.    PLAINTIFF UCC LACKS ARTICLE III STANDING TO PURSUE THE RELIEF REQUESTED BY THE COMPLAINT.

71.    It is a prerequisite to invoking a federal court's subject matter jurisdiction that a

party demonstrate that it has standing to seek the relief it requests.[45]  Article III of the United

States Constitution requires a party to show that, at a bare minimum: (1) it has suffered an

*"injury in fact"* that is (2) "fairly . . . trace[able]" to the defendant's conduct, and (3) that such

injury is "likely [to be] redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504

---

[44] *Cf.* 31 L.P.R.A. § 3473, n. 1 ("[I]f the terms of a contract are clear . . . it should not be construed as including things different from those with respect to which the persons interested intended to contract.") (citation omitted).

[45] *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).

U.S. 555, 560-61 (1992).  It is the putative plaintiff's burden to establish that it meets *each* of these requirements before the courthouse doors will open.  *Id.* at 561.[46]

72.     The UCC falls woefully short of carrying that burden, as the Complaint contains *no facts* demonstrating that the UCC has met the constitutional prerequisites of standing.  It is also clear that neither the UCC nor its unsecured creditor constituency have suffered any injury at all (let alone one that is fairly traceable to the PBA's accruing administrative expense claim and that could be redressed by the Court), because as counsel for the Oversight Board has stated in open court, *prepetition unsecured claims are currently being paid*, ahead of constitutionally-senior debt claims.[47]

73.     The UCC instead purports to be advocating for the Commonwealth's interests, rather than its own.  *See, e.g.,* Compl., ¶ 44 ("the *Commonwealth* is entitled to a declaration . . . that the Leases are not entitled to section 365(d)(3) treatment") (emphasis added).[48]   But where a perceived injury has been borne (if at all) by the debtor, the "trustee" (and *not* the UCC) "is the proper person to assert the claim."  *St. Paul Fire & Marine Ins. Co. v. PepsiCo.*, 884 F.2d 688, 701 (2d Cir. 1989).[49]   If the UCC wishes to step into the shoes of the Commonwealth to vindicate its interests, it must first seek derivative standing to do so.[50]   Until then, the Oversight

---

[46] *See also Spokeo*, 136 S.Ct. at 1547 ("Where, as here, a case is at the pleading stage," that means "the plaintiff must clearly allege facts demonstrating each element.") (citations and quotations omitted).

[47] *See* Sept. 13, 2018 Hr'g Tr. at 88:8-10 (Mr. Bienenstock: "And the Commonwealth has been paying vendor claims, pre-petition vendor claims throughout the case.  The Commonwealth has been paying the retirees.").

[48] It is fundamental that a plaintiff may not litigate the rights of others.  *See Valley Forge Christian Coll. v. ASCSI*, 454 U.S. 464, 474-75 (1982).

[49] *See also Fin. Oversight & Mgmt. Bd. for P.R.'s Omnibus Reply to Omnibus Response of Official Comm. of Unsec. Creditors to GDB/AAFAF's and Oversight Bd's Standing Objs.*, Case No. 18-01561-LTS (Sep. 27, 2018) [Dkt. No. 171] at ¶ 12 ("The UCC is *not* statutorily authorized to represent the Title III Debtors' interests—only the Oversight Board, as sole representative and trustee of each Title III Debtor, is permitted to do so.") (emphasis in original).

[50] The Oversight Board for its part has suggested that derivative standing is not available under PROMESA.  *See generally Obj. of Fin. Oversight & Mgmt. Bd. to Official Comm. of Unsecured Creditors' Motion for Order*

Board remains the sole representative of the Debtors, and the Commonwealth's resources should not be wasted on the UCC's duplicative participation in this proceeding.

74.     Presumably aware that the UCC lacks standing to pursue the Complaint, Plaintiffs go out of their way to note that the Oversight Board "consents to such standing."  Compl., n. 2. But consent cannot confer standing, nor can it cure a fundamental jurisdictional defect.  A party's standing to assert a cause of action goes to the heart of the "case or controversy" requirement of Article III of the Constitution, and is a fundamental prerequisite to invoking a federal court's jurisdiction.[51]  It is black letter law that a "lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties."  *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934).  Plaintiff Oversight Board's "consent" is as irrelevant as it is ineffective, and the Complaint should be dismissed with respect to the UCC as Plaintiff.

## CONCLUSION

75.     For the foregoing reasons, Defendant-Intervenors respectfully request that the Court enter an order substantially in the form attached hereto as **Exhibit A** granting the Motion.

*[Signature page follows]*

---

*Granting Derivative Standing to Act on Behalf of Title III Debtors for Certain Limited Purposes and Other Related Relief with Respect to Restructuring of Gov. Dev. Bank for P.R.*, Case No. 17-03283-LTS (Sep. 21, 2018) [Dkt No. 3959].

[51] *Spokeo*, 136 S.Ct. at 1547.

Date: March 21, 2019

**G. CARLO-ALTIERI LAW OFFICES, LLC**

By: */s/ Gerardo A. Carlo*
Gerardo A. Carlo
USDC PR No. 112009
Telephone: (787) 247-6680
gacarlo@carlo-altierilaw.com

By: */s/ Kendra Loomis*
Kendra Loomis
USDC PR No. 227408
Telephone: (787) 370-0255
loomislegal@gmail.com

254 San Jose St., Third Floor
San Juan, Puerto Rico 00901
Telephone: (787) 247-6680
Facsimile: (787) 919-0527

*Counsel for the PBA Funds*

**MORRISON & FOERSTER LLP**

By: */s/ Grant J. Esposito*
James M. Peck (admitted *pro hac vice*)
Gary S. Lee (admitted *pro hac vice*)
Grant J. Esposito (admitted *pro hac vice*)
David J. Fioccola (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jpeck@mofo.com
glee@mofo.com
gesposito@mofo.com
dfioccola@mofo.com

*Counsel for the PBA Funds*

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
   Heriberto Burgos Pérez
   USDC-PR 204809
   Ricardo F. Casellas-Sánchez
   USDC-PR 203114
   Diana Pérez-Seda
   USDC-PR 232014
   P.O. Box 364924
   San Juan, PR 00936-4924
   Telephone:  (787) 756-1400
   Facsimile:   (787) 756-1401
   Email:   hburgos@cabprlaw.com
            rcasellas@cabprlaw.com
            dperez@cabprlaw.com

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Mark C. Ellenberg*
   Howard R. Hawkins, Jr.*
   Mark C. Ellenberg*
   William J. Natbony*
   Ellen M. Halstead*
   Thomas J. Curtin*
   Casey J. Servais*
   200 Liberty Street
   New York, NY 10281
   Telephone: (212) 504-6000
   Facsimile:  (212) 406-6666
   Email:   howard.hawkins@cwt.com
            mark.ellenberg@cwt.com
            bill.natbony@cwt.com
            ellen.halstead@cwt.com
            thomas.curtin@cwt.com
            casey.servais@cwt.com

* Admitted *pro hac vice*

*Attorneys for Assured Guaranty Corp. and Assured
Guaranty Municipal Corp.*

35

**BRACEWELL LLP**

*/s/ Kurt A. Mayr*
Kurt A. Mayr (*pro hac vice*)
David L. Lawton (*pro hac vice*)
Shannon B. Wolf (*pro hac vice*)
City Place I, 34th Floor
185 Asylum Street
Hartford, CT 06103
Telephone: (860) 256-8534
Email: kurt.mayr@bracewell.com
Email: david.lawton@bracewell.com
Email: shannon.wolf@bracewell.com

*Counsel for the QTCB Noteholder Group*

**CORREA ACEVEDO & ABESADA LAW
OFFICES, P.S.C.**

*s/ Roberto Abesada-Agüet*
USDC-PR No. 216706
E-Mail: ra@calopsc.com

 */s/ Sergio E. Criado*
Sergio E. Criado
USDC-PR No. 226307
E-Mail: scriado@calopsc.com
Centro Internacional de Mercadeo, Torre II
# 90 Carr. 165, Suite 407
Guaynabo, P.R.  00968
Tel. (787) 273-8300; Fax (787) 273-8379

*Co-Counsel for the QTCB Noteholder Group*

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
------------------------------------------------------------------------- x
In re:                                               :
                                                     :
THE FINANCIAL OVERSIGHT AND                          :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                    :   Title III
                                                     :
        as representative of                         :   Case No. 17-BK-3283 (LTS)
                                                     :
THE COMMONWEALTH OF PUERTO RICO, et al.,             :   (Jointly Administered)
                                                     :
        Debtors.¹                                    :
------------------------------------------------------------------------- x
THE FINANCIAL OVERSIGHT AND MANAGEMENT               :
BOARD FOR PUERTO RICO,                               :
                                                     :
        as representative of                         :
                                                     :   Adv. Proc. No. 18-00149
THE COMMONWEALTH OF PUERTO RICO, et al.,             :
                                                     :
        and                                          :
                                                     :
THE OFFICIAL COMMITTEE OF UNSECURED                  :
CREDITORS OF ALL TITLE III DEBTORS (OTHER            :
THAN COFINA),                                        :
                                                     :
        Plaintiffs,                                  :
                                                     :
v.                                                   :
                                                     :
PUERTO RICO PUBLIC BUILDINGS AUTHORITY,              :
                                                     :
Defendant.                                           :
------------------------------------------------------------------------- x
```

---

¹ The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

## <u>ORDER GRANTING JUDGMENT ON THE PLEADINGS</u>

Upon consideration of the motion for judgment on the pleadings filed by the PBA Funds,

Assured, and the QTCB Noteholder Group (the "<u>Motion</u>");[2] and having found and determined

that the relief requested in the Motion is warranted; and having considered any objections filed to

the Motion, and all such objections having been withdrawn, resolved, or overruled on the merits;

and after due deliberation and sufficient cause appearing therefor and based upon the record, **IT**

**IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED.

2.      Judgment is awarded against Plaintiffs on their first and second causes of action.

3.      Plaintiff UCC is dismissed from the Adversary Proceeding.

4.      The terms and conditions of this Order shall be effective and enforceable

immediately upon its entry.

5.      The Court shall retain jurisdiction with respect to all matters arising from or

relating to the implementation of this Order.

Dated: _____, 2019

_____
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

**EXHIBIT B**

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

_____

141 D.P.R. 362

[Certified Translation]

*3/18/19*

DANIEL TOMLINSON
CERTIFIED TRANSLATOR
ADMINISTRATIVE OFFICE OF
THE UNITED STATES COURTS

1996 JTS 108, 141 D.P.R. 362, 1996 WL 499338 (P.R.)

MARIA TERESA RODRIGUEZ TORRES, on her own behalf and in representation of her minor children
FRANCISCO PRADO RODRIGUEZ and EVA PRADO RODRIGUEZ, plaintiffs and appellants,

v.

AUTORIDAD DE EDIFICIOS PUBLICOS and the CORPORACION
INSULAR DE SEGUROS, defendants and appellees.

In the Supreme Court of Puerto Rico

*Number:* RE-93-88

*Decided:* July 19, 1996

July 19, 1996.

1. WORKER COMPENSATION – NATURE AND GROUNDS FOR EMPLOYER LIABILITY – IN GENERAL.

The concept of "statutory employer" establishes that all employers who comply with the legal obligation of insuring their employees with the State Insurance Fund will be immune from any accident that the latter may sustain in the course of their employment. As a result, employees can only claim the benefits provided by the Fund from their employer.

2. ID. – EMPLOYERS INCLUDED – IN GENERAL – STATUTORY PRECEPTS – INSURED EMPLOYER.

The employer immunity of the State extends to all its agencies the premium payment to the State Insurance Fund is only one: the public treasury.

3. ID. – NATURE AND GROUNDS FOR EMPLOYER LIABILITY – IN GENERAL.

In cases of employer immunity, the concept "third party" refers to any person foreign to, apart and separate from the legal interaction that relates to the statutory employer, or any person aside from the injured employee and his insured employer.

4. PUERTO RICO – COMMONWEALTH – ASSETS, CONTRACTS AND LIABILITIES – IN GENERAL.

There are three major types of public entities, to wit: (1) Government agencies or departments; (2) public corporations created by statute, and (3) share-issuing corporations organized under the private corporation laws and that are controlled partially or totally by the Government.

5. CORPORATIONS – INCORPORATION AND ORGANIZATION – DIFFERENT CLASSES OF CORPORATIONS – IN GENERAL.

In determining whether an instrumentality is a public corporation or not, the following criteria must be examined: (1) whether it has its own income; (2) whether it has fiscal autonomy to make loans, issue bonds and bank accounts; (3) whether it owns properties; (4) whether it has a Board of Directors; (5) whether it can accept donations, and (6) whether it has the capacity to execute agreements or contracts. **\*363**

6. ID. – ID. – ID. – ID.

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

_____

141 D.P.R. 362

Pursuant to the criteria established by case law for determining whether an instrumentality is a public corporation, the Supreme Court has decided that both the Government Development Bank and the Public Buildings Authority are public corporations that operate as a business or private enterprise.

7. ID. – ID. – ID. – ID.
Although public corporations operate in an autonomous manner, they are government instrumentalities that answer to some eminently public purposes and the services they provide are essential for the proper functioning of the Government. In addition, the funds they use to operate these corporations are considered public, regardless of the fact that they do not become part of the State budget.

8. WORKER COMPENSATION – EMPLOYERS INCLUDED – IN GENERAL – STATUTORY PRECEPTS – IN GENERAL.
In determining whether an entity should be considered a third party in accordance with Art. 31 of the Work Accident Compensation System Act, 11 L.P.R.A. Sect. 31, or whether, to the contrary, it should be covered by the statutory employer immunity, the contractual relationships between the direct employer of the worker and the alleged secondary statutory employer must be examined. Immunity will only be given to the employer on whom the financial weight of the system falls by means of the payment of annual fees.

**Synopsis**
JUDGMENT by *Rene Arrillaga Belendez, J.* (San Juan) that grants a certain request for summary judgment filed by the defendants and dismisses the complaint without imposing costs or attorney fees. *Reversed and case remanded to the trial court for further proceedings pursuant to the opinion.*

*Jorge M. Suro Ballester*, attorney for appellants; *Francisco J. Torres*, of *Mena & Doran*, attorney for appellees.

THE ASSOCIATE JUSTICE REBOLLO LOPEZ issued the opinion of the Court.

The plaintiff appellant, Maria Torres Rodriguez, was working as an economist at the Government Development Bank, an institution that has its main offices at the government office complex known as "Centro Gubernamental de Minillas" [Minillas Government Center], a complex that is "owned" by the Puerto Rico Public Buildings Authority.
**\*364** On December 23, 1991, Ms. Rodriguez sustained an accident or fall – allegedly, after slipping in a puddle of oil – in a covered area that "connects" the north building of said Government Center to the building where the Government Development Bank offices are located.

As a result of said accident, Ms. Rodriguez, on her own behalf and in representation of her minor children, filed a complaint *on damages* with the former Puerto Rico Superior Court, San Juan Division, against the Public Buildings Authority and its insurance company, the Corporacion Insular de Seguros. The "defendant," after answering the complaint, filed a motion for summary judgment in which it alleged, in short and in its pertinent part, that the Authority had "employer immunity" because both it and the direct employer of the plaintiff were instrumentalities of the Commonwealth of Puerto Rico.

After the plaintiff filed the corresponding opposition, the trial court entered judgment accepting the assertion by the defendant as to employer immunity or "statutory employer." In disagreement, plaintiff turned to this Court alleging that the Trial Court had erred

…by concluding that the AEP [Public Buildings Authority] is a statutory employer of an employee of the Government Development Bank who sustained an accident in the course of her employment on an AEP property, without first determining the existence of any contractual relationship whatsoever between the AEP and the Government Development Bank and without taking into consideration that the Government Development Bank pays the State

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

_____

141 D.P.R. 362

Insurance Fund the premiums to insure its employees with funds that it generates from its daily operations and not from an allotment of funds from the central government. Petition for review, pg. 5.

We address the appeal filed. Being in a position to decide it, we proceed to do so. **\*365**

I

**[1]** The concept of the "statutory employer" is based on the provisions of Arts. 19 and 20 of the Work Accident Compensation System Act, 11 L.P.R.A. Sect. 20 and 21. Pursuant thereto, all employers who comply with the legal obligation that they have to insure their employees with the State Insurance Fund will have "immunity" with respect to any accident sustained by said employees in the course of their employment, and said employees will only be able to claim the benefits that are provided by the Fund. *Admor. F.S.E. v. Flores Hnos. Cement Prods.,* 107 D.P.R. 789, 792 (1978).

**[2-3]** In *F.S.E. v. E.L.A.,* 111 D.P.R. 402 (1981*)*, we faced a *similar situation* to the one raised in the case that is under our scrutiny today. In said case, a female employee of the Puerto Rico Police, in the duties of her employment as a lecturer of said governmental agency, sustained an accident on the stairs of a Department of Public Instruction school.[1] The State Insurance Fund was subrogated in the rights of said employee and sued the Commonwealth of Puerto Rico, alleging negligence on behalf of the Department of Instruction. *We decided* in said case that the complaint filed was *not* proper in law because, given the particular facts of the case, the State could *not* be considered a "third party" in view of the fact that the employer immunity of the State extends to all of its agencies and instrumentalities.[2] In that regard, we stated that the "source of the money for the payment of the State Insurance Fund premium is only one: the public treasury." **\*366**

The plaintiff appellant, *however*, alleges that the case at bar is *distinguishable* from the case reviewed above *in view of the fact that* here it is not a matter of governmental agencies, such as the Puerto Rico Police and the Department of Public Instruction, *but it is [a matter] of public corporations*, as are the Government Development Bank and the Public Buildings Authority.[3] **\*367**

II

…public, to wit: (1) Government agencies or departments; (2) public corporations created by statute, and (3) share-issuing corporations organized under the private corporation laws that are controlled partially or totally by the Government. *Torres Ponce v. Jimenez,* 113 D.P.R. 58 (1982).

**[5]** We have decided, furthermore, that in determining whether a certain instrumentality is, or is not, a public corporation the following criteria, among others, should be considered:

(a) whether it has its own income;

(b) whether it has fiscal autonomy to make loans, issue bonds and bank accounts;

(c) whether it owns properties;

(d) whether it has a Board of Directors;

(e) whether it can accept donations;

----- WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. -----

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

_____

141 D.P.R. 362

(f) whether it has the capacity to execute agreements or contracts.[4]

As far as this aspect, that is, whether an instrumentality of the Government operates or not, *as an "enterprise or private company,"* we stated in *A.A.A. v. Union de Empleados A.A.A.,* 105 D.P.R., 437, 455 (1976), that the following factors should be considered:

> …whether the employees of the agency in question are covered by the Commonwealth Personnel Act; whether the services provided by the agency by their intrinsic nature have never been provided by private enterprise; whether the agency has the capacity to operate as a private enterprise or business; whether the agency, in fact, operates as a private enterprise or company; the degree of fiscal autonomy that the agency has; the degree of administrative autonomy that it has; whether **\*368** a price or fees are charged for the service provided (a price that should be basically equivalent to the value of the service); whether the powers and authority granted in the agency organic act fundamentally make it resemble a private enterprise; and whether the agency does or does not have the capacity to engage in for-profit businesses or activities in the future whose purpose is financial gain. Others can be added to these criteria, without trying to exhaust the list: the structure of the entity as such; the power of the agency to sue or be sued in an unlimited manner; the power to obtain its own funds in the general securities market based on its financial record and without pledging the credit of the Commonwealth; the faculty to acquire and administer properties without the intervention of the State ….

**[6]** After an examination and analysis of the powers or faculties that are held by law both by the Government Bank and by the Public Buildings Authority – see note 2, above – we *do not* have any doubts as to the fact that *both* instrumentalities in actuality are public corporations and operate as a business or private enterprise; a conclusion that is inescapable when we consider, *and apply*, the "criteria" reviewed above, established by this Court in *A.A.A. v. Union de Empleados A.A.A.,* above, and *Canchani v. C.R.U.V.,* 105 D.P.R. 352 (1976).

Does that necessarily mean, as the plaintiff appellant alleges, that in this case the doctrine of employer immunity should *not* be applied or, expressed another way, can said Authority be considered a "third party" in the light of the provisions of the Work Accident Act? The answer to said question is *not* simple. In fact, and as we will discuss below in detail, this Court has issued, on this subject, decisions that end up being a bit inconsistent with each other. We have the duty, as a result, to face the controversy raised in a decisive manner without any fear whatsoever "of us being characterized as inconsistent." See *Reyes Coreano v. Director Ejecutivo,* 110 D.P.R. 40 (1980).

**[7]** It should be kept in mind, on the one hand, that public **\*369** corporations, although they operate in an autonomous manner, for that reason do not stop being governmental instrumentalities that respond to eminently public purposes, and that the services they provide are a basic necessity for the proper operation of our Government. That is, we are facing "corporations" that have duties, responsibilities and obligations toward the State and whose "corporate structure" has been instituted by the State for some particular public purposes. Finally, we should not forget that after all, the funds or money that said corporations use in their operations actually are public funds or money, that is, money that belongs to the State. As we stated in *Commoloco of Caguas, Inc. v. Benitez Diaz,* 126 D.P.R. 478, 493 (1990), "the funds with which these corporations operate are considered public regardless of the fact that they don't become part of the State budget."

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

---

141 D.P.R. 362

*On the other hand*, and as we stated before, both the Government Development Bank and the Public Buildings Authority are public corporations that operate practically as a "private business," and do not receive significant direct allotments of public funds from the central government, that is, they are corporations that perform their public function by generating their own money. In fact, in this case the only link existing between both corporations is the lease agreement by means of which the Bank occupies the space in the office complex owned by the Authority. Both corporations pay their own premiums, separately, to the State Insurance Fund, in protection of their own employees, with money generated in their respective operations, money that is not part of the general budget of the Government.

It is an unquestionable fact that the Public Buildings Authority, as a property owner, engages in the leasing and administration of the majority of the buildings or structures **\*370** that house the executive, legislative and judiciary machinery of the Commonwealth of Puerto Rico. See Art. 2 of Act No. 56 of June 19, 1958 (22 L.P.R.A. Sect. 903). To determine that – as a result of the mere execution of a lease agreement carried out between the Public Buildings Authority and another public corporation or agency – the former is covered by the doctrine of employer immunity, is really equivalent to deciding that said Authority is a "statutory employer" of practically all the public employees and public officials of our country, which does not seem to be justifiable in view of the structure, faculties and powers that the law that creates it gives to said authority.

This case, in our way of seeing things, can be distinguished from the case of *F.S.E. v. E.L.A.*, above. The latter, was a matter of *agencies or departments* of the Government – the Puerto Rico Police and the Department of Public Instruction – whose operational funds come *directly* from the State. That is, it was a matter of agencies or departments that are subsidized, *in full and directly*, by the State, the latter being, as a result, the *actual employer* of the employees of both agencies; for that reason, there is no doubt, that what is stated in said case can be justified to the effect that the "source of the money for the payment of the premium is only one: the public treasury."

**[8]** We are of the criterion that the case that is before our consideration today raises a different situation. There is no doubt that, in the case of public corporations, the money that said corporations generate has to be, *by necessity*, categorized as "public money," money with which the premiums of the State Insurance Fund are paid.[5] *Now*, that money does not come directly from the Government's general budget, as is the case with the governmental agencies or **\*371** departments such as the Puerto Rico Department of Education and the Puerto Rico Police. *An analysis of our decisions about the subject reveals that we have emphasized* – with respect to the determination as to whether an entity should be considered a "third party," in the light of the provisions of Art. 31 of the Work Accident Compensation Act,[6] 11 L.P.R.A. Sect. 31, or whether, to the contrary, the immunity of "statutory employer" should cover it with respect to the injured worker – *that this determination will depend, mainly, on the contractual relationships between the worker's direct employer and the other employer, that is, the alleged "second" statutory employer*; that is, whereas *it can only be justified* that immunity is granted to the employer "on whom the financial weight of the system falls, by way of the payment of the annual fees," there being *no* justification whatsoever "in extending the immunity that the law grants to persons who do not contribute personally to cover the expenses of the Fund when they have engaged in negligence and have caused damages to other employees." *Lopez Rodriguez v. Delama*, 102 D.P.R. 254, 258-259 (1974).

Expressed in a different manner, and as we stated in *Torres Solis et al. v. A.E.E. et al.*, 136 D.P.R. 302, 310 (1994) the determination of

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

---

141 D.P.R. 362

…whether a defendant is or is not a *"statutory employer"* involves examining the contractual relationships between the latter and the actual employer of the workers. *Vda. de Costas v. P.R. Olefins*, supra. *"In the absence of that legal link that relates the worker's direct employer to the one who caused the injury in the* 'common legal obligation,' *of insuring the employee with the Fund, we will be facing a "third party," without the statutory protection against complaints by workers injured on the job."* …*Santiago Hodge v. Parke Davis Co.*, supra, pg. 12. See *Ruiz Diaz v. Vargas Reyes*, supra. (Emphasis added and in the original.)

In this case, **\*372** the weight of the expenses has not fallen on the Public Buildings Authority as it relates to the work accident sustained by the plaintiff herein, Maria Torres Rodriguez *and* the Authority *has also not* contributed to the payment of the premiums that the Governmental Development Bank paid to the Fund with respect to its employees.[7] In view of what was stated above, *we find that the plaintiff appellant has a cause of action, for damages, against the appellee Public Buildings Authority for which reason it can, and should be, considered a "third party" that is referred to in the previously cited Art. 31 of the Work Accidents Compensation System Act.*

*Judgment shall be pronounced in accordance.*

Associate Justice Fuster Berlingeri issued a concurring opinion. Chief Justice Andreu Garcia did not intervene.

**--O—**

Concurring opinion issued by Associate Justice Fuster Berlingeri.

I share the purpose sought by the majority of the Court **\*373** in this case, of trying to rectify and clarify the rule that governs determining whether the doctrine of employer immunity applies in situations in which a governmental instrumentality is sued for damages by an employee of another public entity. Our previous decisions on that matter certainly have not all been based on correct grounds, as I pointed out in my dissent in *Morales v. Autoridad de Carreteras*, 140 D.P.R. 1 (1996).

In particular, it seems to me correct to abandon the schema for deciding that was used both in *Soc. de Gananciales Maldonado v. E.L.A.*, 129 D.P.R. 961 (1992), and in *Morales v. Autoridad de Carreteras*, supra, according to which the application of the doctrine of employer immunity depended on dubious and confusing distinctions about whether the public entity in question was a "State instrumentality," or whether, on the other hand, it was a "public corporation." I am in agreement with what the majority has decided now, as far as the fact that the criteria for deciding should be as to which entity paid the State Insurance Fund premiums with respect to the employee plaintiff. This criterion responds to what is provided in the Work Accident Compensation System Act itself and to our decisions about the matter in the core decision of *F.S.E. v. E.L.A.*, 111 D.P.R. 402 (1981). In this manner, the erroneous decision of this Court is correctly reversed as to the Public Buildings Authority having employer immunity in cases such as the one at bar, made in *Soc. de Gananciales Maldonado v. E.L.A*, supra, and that was reiterated likewise by a majority in this Court only some months ago in *Morales v. Autoridad de Carreteras*, supra.

Finally, I trust that the statements in the majority opinion in the case at bar about the different "types of public entities," in particular the ones relating to whether an instrumentality of the Government operates as a private business or not, will not, in turn, give rise to confusion in future **\*374** cases. Such statements are not really necessary,

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

_____

141 D.P.R. 362

because the majority decision is not based on them; they suffer from some of the incompatibilities and perplexities that the majority attempts to overcome with said opinion, and do not reflect the annotations that we recently made to the controlling criteria in question in *J.R.T. v. Corp. del Conserv. Musica P.R.*, 140 D.P.R. 407 (1996).

Footnotes

1.  Today, the Department of Education.
2.  This Court has defined the concept of "third party" as any "person who is foreign to, apart and separate from the legal interaction that relates to the statutory employer" or any "person aside from the injured employee and his insured employer." *Lugo Sanchez v. A.F.F.*, 105 D.P.R. 861, 866 (1977). See: *F.S.E. v. E.L.A.*, D.P.R. 402 (1981); *Lopez Rodriguez v. Delama*, 102 D.P.R. 254, 258 (1974).
3.  The Government Development Bank (hereinafter the Bank) was created by virtue of Act No. 17 of September 23, 1948, as amended, 7 L.P.R.A. Sect. 551 *et seq.* The Bank is a corporation that was created "as a governmental instrumentality" in order to "help the state government in the performance of its fiscal duties and fulfill its governmental responsibility of promoting the Puerto Rico economy more effectively, and especially its industrialization." L.P.R.A. Sect. 551. In addition, the Bank acts "as a fiscal agent … payer agent and …financial or informative consulting agent of the Commonwealth, of the agencies, instrumentalities, commissions, authorities, municipalities and political subdivisions, of the Governor, of the Executive Council … and of the Puerto Rico Treasury." 7 L.P.R.A. Sect. 552.
    The Bank "as a depositary or trustee" has the power to "acquire assets for its corporate purposes by grant, gift, purchase, legacy or donation," and has the capacity to "sue and to be sued." 7 L.P.R.A. Sect. 552. The corporate power is exercised by a Board of Directors composed of seven (7) members who are appointed by the Governor with the approval of the Council of Clerks. 7 L.P.R.A. Sect. 552. The Bank has the authority to lend and borrow money, issue bonds, promissory notes, mortgage obligations, invest its funds, create subsidiary or affiliate companies and "exercise all incidental powers that may be necessary or proper for the purposes of conducting its previously-mentioned businesses and purposes." 7 L.P.R.A. Sect. 552. The debts or obligations that the Bank incurs will not be the Commonwealth's or that of any of its municipalities or political subdivisions, completely to the contrary, the Bank is the only one responsible for them. 7 L.P.R.A. Sect. 553. The Bank is exempt from paying taxes on the income from its bonds, promissory notes, mortgage obligations or other types of obligations. 7. L.P.R.A. Sect. 553. The Bank has the power to "appoint, employ and hire the services of officers, agents, employees and professional assistants and to pay for those services." 7 L.P.R.A. Sect. 552. In addition, the employees of the Bank are excluded from the Puerto Rico Public Service Personnel Act, 3 L.P.R.A. Sect. 1301 *et seq.*
    The Public Buildings Authority, *for its part*, is a corporation organized as an instrumentality of the Commonwealth of Puerto Rico, which will exercise "public and essential functions of the Government"; a corporation that has the power to "have perpetual succession." It is directed by a Governing Board, the members of which are appointed by the Governor with the advice and consent of the Senate. The Authority is authorized, for the purpose of generating the funds to be used by it, to issue bonds, which are guaranteed by the Government, and the latter binds itself to the bond holders "to not limit or alter the rights or powers that are hereby granted to the Authority until said bonds … have been fully satisfied and withdrawn." The Authority has the capacity to sue and be sued; it has the power to acquire any kind of assets, in relation to which it has complete control and supervision. It has, in addition, the power to determine the character and need of all of its expenses and the form and manner as to how they should be incurred, authorized and paid as well as the power to create, adopt, amend and repeal rules and regulations, which will govern the standards of its businesses in general. See 22 L.P.R.A. Sect. 902 *et seq.*
4   See *Canchani v. C.R.U.V.,* 105 D.P.R. 352 (1976).
5   We believe, however, that such *technicality cannot obliterate* the fact that it is a matter of two (2) public corporations that operate, *for all practical purposes*, as a business or private enterprise.
6   Act No. 45 of April 18, 1935.
7   That, precisely, was the *reason for deciding* in the most recent of the cases in which this question was presented to us, a case that this Court decided through the procedural mechanism for deciding that is a judgment, a decision that *does not* constitute a precedent. *Morales v. Autoridad de Carreteras,* 140 D.P.R. 1 (1996), this Court decided, *based on the grounds stated above*, that a member of the Puerto Rico Police who sustained an accident in one of the toll booths of the Luis A.

Rodriguez Torres v. Aut. Edif. Pubs., 1996 JTS 108 (1996)

_____

141 D.P.R. 362

Ferre Expressway as a result of the alleged negligence of the Highway Authority, would be able to sue said Highway
Authority for damages. In deciding that way, this Court stated that it was *not* proper "to extend the statutory immunity to
the Authority, because it did not contribute to pay the costs of the Fund in the treatment" of the injured policeman.
The same solution is imposed in this case; that being despite what was decided by this Court, likewise by way of a
judgment, in the case of *Soc. de Gananciales v. E.L.A.,* 129 D.P.R. 961 (1992). In said case, we decided that The Public
Buildings Authority did *not* qualify as a "third party" that is referred to in Art. 31 of the Work Accident Compensations Act.
11 L.P.R.A. Sect. 11, allegedly because it was not a "public corporation." *A subsequent analysis of said situation convinces us
that said conclusion was an erroneous one.* As a result, what was decided there, insofar as it is inconsistent with the
decision made today, *should be understood as expressly reversed.*

_____

End of Document                                          © Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

Page 1


**COMMONWEALTH OF PUERTO RICO
DEPARTMENT OF JUSTICE**


February 16, 1999


Hon. Wilfredo Jirau Toledo
Executive Director
Public Buildings Authority
Minillas Government Center
6th Floor, Northern Building
Ave. De Diego Pda. 22
Santurce, Puerto Rico

Inquiry No. 133-99-A

Dear Mr. Executive Director:

 I refer to your request for a legal opinion regarding the Ombudsman Office's legal authority or ability to demand free use of three of the Public Buildings Authority's *[Autoridad de Edificios Públicos]* (A.E.P.) office spaces.

The file containing the inquiry includes a copy of a memorandum submitted by the A.E.P., which concludes that the Ombudsman Office cannot use A.E.P. offices without paying rent.  It also includes a copy of the memorandum from the Ombudsman Office, which concludes that the A.E.P. must assign the use of these offices free of charge, pursuant to Articles 24 and 25 of Law No. 134, dated June 30, 1977, as amended. The Ombudsman also grounds its requests in custom and usage, because the A.E.P. had previously assigned some of its offices to the Ombudsman Office free of charge by way of an assignment agreement in the Caguas and Humacao Municipalities.[1]

Page 2

The Ombudsman Office was created by way of Law No. 134, dated June 30, 1977, as amended, 2 L.P.R.A. §701 et seq. (Sup. Ac. 1998). Article 10 of said Law establishes the overall authority of the Ombudsman: "The Ombudsman shall have the jurisdiction to investigate administrative acts of agencies and may exercise the power and authority granted by this Chapter." Furthermore, Article 13 outlines which administrative acts are to be investigated by the Ombudsman:

---

[1]It is unknown from the documents located in the file whether or not the contracts in question were renewed. The only contract submitted had a term of two (2) years which expired in March 1990. This time, the Ombudsman Office is requesting from the A.E.P. the use of office spaces located in the Yauco, Aguadilla and Caguas' government facilities free of charge.

"Any of the following alleged administrative acts shall be subject to investigation:

(a)    Those that violate the law or regulation;

(b)    Those that are irrational, unjust, arbitrary, offensive, or discriminatory;

(c)    Those that are based on a factual error or on inadmissible or irrelevant grounds;

(d)    Those that do not include a satisfactory declaration of purpose when required by law or regulation; or

(e)    When they are inadequately or erroneously enforced.

The Ombudsman may conduct investigations for purposes of recommending an appropriate remedy."

Page 3

Based on the provisions above, we can discern that the Ombudsman has broad investigatory power to oversee administrative acts[2] from administrative agencies subject to its intervention. In order to perform this power, Article 24 of the foregoing Law No. 134 establishes that the Ombudsman may request resources from public agencies and instrumentalities that will enable it to perform the duties it has been delegated. It is based on this article that the Ombudsman believes that the A.E.P. is required to assign the use of office spaces free of charge:

"In order to pursue the objectives outlined in this Chapter, the Office **may use available resources within public agencies and instrumentalities**, such as the use of information, offices, personnel, technicians, equipment, material and other resources, and these agencies and instrumentalities are authorized by this Chapter to provide these resources to the Ombudsman…" (Emphasis Added).

An analysis of the foregoing legal provision has revealed that its scope is not what the Ombudsman Office has interpreted it to be. The Article transcribed above certainly authorizes public agencies and instrumentalities subject to the Ombudsman's jurisdiction to make the necessary resources available so that it may perform is oversight duties. However, the intention of this Law is for these resources to be made available only during the course of an investigation that the Ombudsman is conducting in a specific agency. We have examined the legislative history of the aforementioned Law No. 134, and there is no legislative intent whatsoever that requires agencies to assign their facilities to the Ombudsman Office free of charge and for an indefinite period of time, especially if the Ombudsman is not conducting any investigation in these agencies. To the contrary, we understand that the legislative intent when drafting this Article was to provide the Ombudsman with the necessary facilities and resources at a specific time within the agency that it is investigating at that particular moment in time.

Page 4

---

[2] The term "administrative act" is defined in Article 2 of the aforementioned Law 134 as "any action, omission, decision, recommendation, practice or procedure carried out by an agency" as this latest term is also defined in the law.

An example of this is if the Ombudsman Office were to be investigating a complaint against the Health Department, this Article would allow the Ombudsman Office to use the resources it would need within the Health Department in order to conduct its investigation. The Health Department, in turn, would be authorized in accordance with this article to provide the Ombudsman with its resources while the investigation is active.

Furthermore, the legislature wanted to concede a certain margin of discretion to the agencies so that they could fully cooperate with the investigations conducted by the Ombudsman without affecting the services they provide. That is why the legislature uses the phrase, "may use available resources" when drafting the foregoing Article. In this regard, it must be pointed out that when permissive terms such as "may" are used, they are granting discretion. See Capó v. Hartman y Cía., 57 D.P.R. 196 (1950) y Ops. Sec. Just. No. 14 de 1982 y No. 30 from 1977.  When using the word "may" instead of "shall," it is our understanding that the legislator sought to provide certain flexibility to agencies, so that they could cooperate with the Ombudsman while it performed its duties in a way that is consistent with their resources and tax status and without this affecting the public services they provide. We would also note that the Ombudsman is limited to those resources located within the agency.

It is a rule of statutory construction that when interpreting a law, no words or notions that were not intended by the legislature are to be added, because when the terms of the statute are clear and susceptible to an unambiguous interpretation, it must be understood literally. The straightforward and unmitigated language used in the statute must not be interpreted as providing something that the legislature did not intend to provide. See Ops. Sec. Just. No. 23 from 1986 and No. 27 from 1995. When the law is clear and unambiguous, no other meaning must be given to it, i.e., its wording must not be cheapened under the guise of obeying its spirit or celebrating its indulgence. Op. Sec. Just. No. 22 from 1987 and No. 30 from 1995. The legislative intent is clear as to the aims sought by the Law, which is to grant citizens who are adversely affected by administrative decisions a process to which they can resort to in the absence of any other satisfactory legal remedy. That is why the use of these resources must be outlined within this objective and only while the investigation is active. Ruling otherwise would lead to an onerous tax burden on these agencies that, like the A.E.P., are responsible for paying bondholders.

Page 5

Regarding the argument outlined by the Ombudsman Office related to the A.E.P.'s already having assigned several office spaces to the Ombudsman Office free of charge, so it therefore must continue to do so according to custom, usage, and equity, we do not believe this to be admissible. It is important to point out that the actions taken or determinations made by government officials or agencies done in error do not create rights nor are they binding or prevent them from being corrected. See Martínez Suris v. Colón Muñoz 92 J.T.S. 99; Del Rey v. J.A.C.L, 107 D.P.R. 348, 355 (1978) Mendoza Aldarondo v. Asociación de Empleados, 94 D.P.R. 564, 575 (1967); E.L.A. v. Rivera, 88 D.P.R. 196, 199 (1963); Infante v. Tribunal Examinador de Médicos, 84 D.P.R. 308, 314 (1961); Op. See. Just. No. 15 from 1985 and No. 16 from 1995. As stated by the Supreme Court of Puerto Rico in Del Rey v. J.A.C.L. supra, pp. 355-356, which quoted Mendoza Aldarondo v. Asociación de  Empleados, 94 D.P.R.564, "… an error made by an administrative agency is not binding and it does not prevent the agency from correcting it. It cannot therefore be assumed that

an administrative act that has unlikely been corrected prevents the relevant agency from correcting it in order to avoid repeating it. This does not constitute a violation to equal protection under the law."

We have scrutinized the A.E.P. enabling law and we have not found any provision that would allow these office spaces to be assigned free of charge. However, since there had been no prior interpretation as to the scope and enforcement of Article 24 of Law No. 134, which previously could have induced the execution of an assignment agreement, we are now facing an error in law. This is why we believe that the A.E.P. is not barred from correcting any mistakes made by previous officials.

Furthermore, being exempt from laws No. 164, dated June 23, 1974, regarding rent payments, and No. 96, dated June 29, 1954, on purchases and supplies contained in Article 25 of the foregoing Law No. 134 are also not a legal basis to conclude that the A.E.P. must assign the use of the office spaces to the Ombudsman Office free of charge. The purpose of exempting the Ombudsman Office from these laws on rent payments and purchases and supplies was to provide this agency the necessary flexibility for the proper performance of its duties without having to face any delays that may be caused by the purchase or the lease of spaces through these agencies. See **Memorial Explicativo *[Explanatory Brief]* del P de la C. 63,** dated February 14, 1977.

Page 6

Be advised that as a general rule, most public agencies must conduct these transactions and obtain the services through the A.E.P. or the General Service Administration. Exemption from these laws does not mean that agencies contracted by an exempt agency to provide services must do so free of charge. It merely frees them from any delays that may be caused when processing any request for these services. If the legislature had any other intent, it would have been expressly stated.

Finally, we have analyzed the legal provisions and case law related to an assignment agreement and we have not found any provision establishing that the essence of this agreement is that it be provided free of charge. On this specific matter see Art.1232 (6) y 1416 et seq. of the Civil Code of Puerto Rico, 31 L.P.R.A. Sec. 3453 (6) y Section 3941 respectively; IBEC. v. Banco Comercial, 117 D.P.R. 371 (1986).  Therefore, we cannot assume that this argument serves as the legal grounds for the Ombudsman Office to claim that the A.E.P. must assign these requested office spaces free of charge.

In consideration of the above, it is my decision that the A.E.P. is not legally required to assign the three office spaces requested by the Ombudsman Office free of charge, unless, as we stated above, the Ombudsman is conducting an investigation within said agency.

I hope the above is useful.

Cordially,


José A. Fuentes Agostini
Secretary of Justice


cc: Hon. Carlos J. López Nieves
Ombudsman

Case:18-00149-LTS   Doc#:63   Filed:03/21/19   Entered:03/21/19 09:00:07   Desc: Main
Document   Page 62 of 84

450 7th Ave
6th Floor
New York, NY 10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

**Morningside**
Translations

# TRANSLATOR AFFIDAVIT

Date: February 11, 2019

To whom it may concern,

Matthew R. Capelle deposes and says:

1. I am over eighteen (18) years of age and believe in the nature and obligation to tell the truth under the penalty perjury.
2. I am employed by (or through) Morningside Translations.
3. I am an independent translator with 11 years' experience
4. I state the following:

I, Matthew R. Capelle, a translator fluent in the Spanish and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare under penalty of perjury under the laws, that the following is a true and accurate translation from Spanish into English of the documents designated as follows:

- NEW_YORK-#1368957-v2-PBA_-_2-16-99_Secretary_of_Justice_Opinion_English

_____

Signature of Matthew R. Capelle

Accurate Translation Services 24/7

## **EXHIBIT D**

[Certified Translation]

3/12/19

*Daniel Tomlinson*
DANIEL TOMLINSON
CERTIFIED TRANSLATOR
ADMINISTRATIVE OFFICE OF
THE UNITED STATES COURTS

### JESUS M. ROSSY, plaintiff and appellant, v. RAFAEL DEL VALLE ZENO, defendant and appellee.

Puerto Rico Supreme Court

June 26, 1925, reviewed; November 10, 1925

No. 3665

**Reporter**

34 D.P.R. 726 *; 1925 PR Sup. LEXIS 308 **

JESUS M. ROSSY, plaintiff and appellant v. RAFAEL DEL VALLE ZENO, defendant and appellee.

**Prior History: [**1]** JUDGMENT by M. Rodriguez Serra, J. (Second District, San Juan), dismissing the complaint, with court costs. Reversed and case remanded.

**Summary of the Case**

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

**Main Terms**

lease, contract, party, thing, lessee, may, eviction, stone, as, extraction, this, use, right, sale, case, judge, proceeding, price, to be, lessor, lower, meters, same, amount, action, states, other, without, nature, complaint

**Headnotes**

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

LESSOR AND LESSEE – LEASE AGREEMENTS AND AGREEMENTS IN GENERAL – REQUIREMENTS AND VALIDITY – NATURE OF THE LEASE AGREEMENT.
- An agreement in which one party grants to another by lease a parcel of land to devote it to the extracting of stone, and in which the contract price is enumerated in part by setting a monthly sum whether or not there is extraction, and also a quota share for each cubic meter as the production exceeds a certain limit, providing the manner for the lessor to confirm the cubic meters of stone used, is by nature a lease agreement.

LESSOR AND LESSEE – THING SUBJECT TO A LEASE (Premises) AND ENJOYMENT AND USE THEREOF – POSSESSION, ENJOYMENT AND USE – DISTINCTION BETWEEN? [sic] THE TERMS "ENJOYMENT" AND "USE."
– The terms "enjoyment" and "use" that are used in Article 1446 of the Civil Code do not involve the same concept and are the ones that mark the difference between a lease and a sale, because the latter [term] does not empower the lessee to dispose of the thing, and the former allows him to make use of the fruits that he produces. The right to the profits has been extended within the concept of lease to the appropriation of the substance of the thing, as occurs in the so-called extractive industries.

LESSOR AND LESSEE – LEASE AGREEMENTS AND AGREEMENTS IN GENERAL – OBLIGATIONS OF THE LESSEE – RETURN OF THE LEASED PROPERTY AT THE CONCLUSION OF THE LEASE. The precept of Article 1464 of the Civil Code that the lessee must return the property at the conclusion of the lease, just as he received it, is not imperative, but rather of a complementary nature and can be revoked or modified by the will of the contracting parties.

LESSOR AND LESSEE – LEASE AGREEMENTS AND AGREEMENTS IN GENERAL – REQUIREMENTS AND VALIDITY – FIXED PRICE OF THE CONTRACT – STATUTORY PRECEPTS. The fixed price that is mentioned in Article 1446 of the Civil Code means the price that can be enumerated or estimated according to whether it is in money or in kind.

LESSOR AND LESSEE – LEASE AGREEMENTS AND AGREEMENTS IN GENERAL – REQUIREMENTS AND VALIDITY – FIXED PRICE OF THE CONTRACT – PARTICIPATION IN THE PROFITS FROM THE LEASED THING. The addition, to the price of the property lease agreement for the extracting of stone, of a quota amount for each cubic meter depending on whether the production exceeds a certain limit, although it makes the price be perceived as irregular, is only a modality that not only does not undermine the name that the parties use to describe the contract, but rather can coexist with the lease and does not make the form of payment complicated or complex.

LESSOR AND LESSEE – LEASE AGREEMENTS AND AGREEMENTS IN GENERAL – REQUIREMENTS AND VALIDITY – STIPULATIONS THAT DO NOT UNDERMINE THE ESSENCE OF THE CONTRACT. The agreement between the parties to the effect that the lessee is obligated to devote the leased property to the sole purpose of extracting stone and that neither of them may practice the same industry, is a legal stipulation that in no way undermines the essence of the lease agreement.

LESSOR AND LESSEE -- LEASE AGREEMENTS AND AGREEMENTS IN GENERAL – REQUIREMENTS AND VALIDITY – RESCISSION OF THE CONTRACT – REASONS THAT MAY GIVE RISE TO THE RESCISSION. As far as the reasons that may give rise to the rescission of the lease agreement, the precept of Article 1459 of the Civil Code does not limit or alter the eviction action when there is noncompliance with any of the conditions that bring about said action and instead coexists with it.

CHOICE OF REMEDIES – RIGHT TO CHOOSE THE PROCEEDING – LEASE AGREEMENT RESCISSION. It is up to the lessor to make the choice as to the proceeding

for obtaining a rescission of a lease agreement, that is, either use the summary eviction or the broader means of the ordinary trial, and once the choice has been made the court has no power to substitute his right to the action.

**Attorneys:** Eduardo Acuña, Jesus M. Rossy and Luis Janer, attorneys for the appellant; Jacinto Texidor, attorney for the appellee.

**Justices:** THE ASSOCIATE JUSTICE FRANCO SOTO, issued the opinion of the court. Associate Justice Wolf did not take part in the resolution of this case.

**Opinion by**: FRANCO SOTO

## Opinion

————————————————————

[*728] THE ASSOCIATE JUSTICE FRANCO SOTO issued the opinion of the court.

This is a summary eviction proceeding. The complaint rests on two causes of action: the first deals with the breach of certain conditions of the contract, and the second, with the non-payment of the lease amount.

The action was taken through all of the steps that are regulated by the special eviction proceedings, but it is worth noting that during the trial the terms or periods for producing evidence were not limited, thus allowing complete latitude for both parties in engaging in that process.

The lower-court judge, however, did not weigh the merits of the evidence and solely limited himself in his decision to resolving the technical issue that he considered in a prior ruling, referring [**2] to the nature of the contract that is the basis for the complaint, and, stating that it was not a matter of a lease agreement, dismissed the complaint so that the parties could settle the merits of the case at a full trial. Nevertheless, it is odd that the parties had accepted the discussion taking for granted the concept of the lease agreement, because in his answer the defendant confined himself to denying the substantive facts of the complaint and to establishing new defenses that in no way were related to describing or naming the

agreement, and without any attempt to challenge the special proceeding that had been chosen by the plaintiff.

The written contract that was offered into evidence is not different from the narrative of the contract made in the complaint. According to what can be read in the agreement, the plaintiff leases to the defendant a 5 ½ *cuerda* parcel of land that is described and demarcated by its [cardinal] points. According to the 2nd clause, the lessee will devote the parcel of land "to the exploration, use and sale of stones in any of their forms in blocks or ashlar stone, rubble, ground and pulverized…," etc. According to the 4th [clause], it is stipulated that the compensation that the lessee will pay the lessor **[\*\*3]** will be established **[\*729]** on the basis of the "Quarry Right" in the manner and proportion that is specified in clause 5 that literally says:

"Fifth: The previously-mentioned 'Quarry Right' will consist of the payment by Mr. del Valle Zeno to Mr. Rossy of a given amount of money for each cubic meter of stone used for sale by the former, according to the following scale:

"A. If the extraction is four hundred cubic meters during each month or less than that amount, or even when he made no extraction whatsoever, Mr. Valle Zeno will pay Mr. Rossy the sum of one hundred dollars for each month, this payment to be verified within the first five days of the month following the extraction and beginning from the date of the execution of this contract that both contracting parties [sign].

"B. If the extraction is verified in the amount of four hundred cubic meters or more, then Mr. Valle Zeno, in addition to the one hundred dollars set in the previous paragraph, letter A, will pay Mr. Rossy the sum of ten cents for each cubic meter of stone, that, in addition to the four hundred cubic meters established in the previous paragraph, letter A **[\*\*4]**, Mr. Valle Zeno uses for sale, the payment thereof also to be verified within the first five days of the month following the extraction and beginning from the date of the execution of this contract that both contracting parties [sign]."

And, in the 6th clause, the manner of confirming the number of cubic meters of stone used by the lessee is provided, and in that regard "Mr. Rossy's person in charge will keep a daily record of the stone according to the vouchers of shipment or tickets that each truck or other vehicle that leaves the property will give to Mr. Valle Zeno's person in charge," …. etc.

The reasoning of the lower-court judge in his opinion for describing under those terms the stone purchase and sale contract is summarized by saying: 1st, the site in question is a stone quarry and was not the subject of cultivation or agricultural or agriculture and livestock exploitation; 2nd, the manner of using it or enjoying it is not left to the free will of the so-called lessee and **[\*730]** a precise form of enjoyment is imposed on him; 3rd, the enjoyment or use that is mentioned in Article 1446 of the Civil Code are terms that imply continuity of existence of the thing being used, and that in this contract **[\*\*5]** its purpose is, in the last instance, to sell, removing the thing from the owner definitively so for him it ceases to exist; and 4th, establishing as a question of merits that the defendant who is required to devote the site to the extraction of stone has made an investment in the amount of $30,000 in the installation of grinding machinery and other tools for extraction and the purchase of cargo trucks to transport the stone to market.

The appellee following the criteria of the lower-court judge alleges further in its pleading that the contract is not a lease because the essential condition that Article 1464 of the Civil Code sets for leases cannot be complied with in it, in other words, that of returning the property in the same condition as the one in which it was received, given that the extraction and sale of stone is agreed to and because the price does not have the characteristics of a lease amount by it having been set as an interest in the profits from the property.

The Civil Code does not define in general the concept of leasing. It mentions that the lease can be of things, or of work or services. Art. 1445, Comp. Sect. 4551. And in

the leasing of things, one of the parties agrees to give [**6] to the other the enjoyment or use of a thing for a given time and fixed price. Art. 1446.

Manresa, in referring to the lease agreement and to equivalent articles of the Spanish Civil Code, states that the legislator was very careful not to risk a unique definition and, instead of defining the lease in general, has defined on the one hand the leasing of things and, on the other hand, the leasing of work and services. Volume 10, pgs. 433 and 434.

It appears, thus, that in the Spanish Civil Code they did not want to insert anything new and tradition was preserved, pulling [*731] its precedents from Roman Law, which old Spanish legislation followed. In the work of Carlos Maynz on Roman Law, translated by Pou y Ordinaz, Volume 2, p. 255, we can read the following:

"A lease presents a strong analogy to a sale: you could even say that it was the sale of the given use of a thing or job. Thus, the majority of the general rules are common to both contracts. For that reason, the lease agreement requires meeting three conditions that we have enumerated in the sale, *res, pretium, consensus."*

****

In a similar vein, Scaevola [**7] states: "We could say without risking a paradox, that a lease is the temporary purchase and sale of the rights to use and to the fruits of something of another." Vol. 24, Part 1, p. 402. And thus, it can be understood that the points of contact that a lease has with the purchase and sale is what leads to confusion in certain cases. Furthermore, in leases, what we could call the ordinary type are not always adopted. At times, and under certain special circumstances, stipulations are made that do make its nature more complex, but for that reason it does not stop being one if that is what they have wanted and has been the intention of the parties, the latter becoming manifest at least by the name that as such has been given to the contract. The legal commentators of Roman Law used to designate any leases of a complex class with the term "locatio irregularis." But currently there seem to be more justified reasons, due to the intensity of economic life, that legal forms are more

diverse and irregular without undermining the essence of the contract. It would not be possible to specify the variety of forms that a lease can take on, but "whenever there is an appropriation that is exclusive and made legitimate by law, whether it is in [**8] a glacier in the Alps or in a very deep pit of a mine, there is something that is subject to leasing." Scaevola, Vol. 24, Part 1, p. 394.

The terms "enjoyment" or "use" that are used in Article [*732] 1446 of the Civil Code in defining the leasing of things, and that the lower-court judge considers involve the same concept, are the ones that mark the difference between a lease and a sale. It is not the same to use as to enjoy. The former does not give the power to dispose of, only implying the use of mere possession, in other words, to obtain from the thing all the use and the services that can be taken from it. The latter is closer to a sale because it allows the lessee to make the fruits or products that it produces his own. And this right as far as the profits is what has been extended within the concept of the lease. By a mental habit, it seems that we can only conceive of the lease under its ordinary aspect of only using, or enjoying, making the agricultural or livestock products our own. The latter concept has been extended to the appropriation of the very substance of the thing and this occurs with the so-called extracting industries, such as the exploration of mines and quarries, forests, [**9] hunting, fishing, etc. And there is nothing in the jurisprudence that denies that such industries can be subject to a lease agreement.

It would seem clear now, given the nature of those extractive industries, that the property cannot be returned as it was received by the lessee. This is the aspect that perhaps has confused the lower-court judge the most and which the appellee asserts. The extractive material, as in this case, the extracting of the stone, can go so far as the extinction of the quarry, just as the vein or deposit in mines can be exhausted, but the property is never extinguished. In addition, the precept of the Civil Code (Art. 1464) that the lessee must return the property at the end of the lease, just as he received it, is not imperative but rather complementary in nature

and can be revoked or modified by the will of the contracting parties. Manresa, Volume 10, p. 581.

On the other hand, the manner in which the price has been established is discussed, and it is alleged by the appellee that it does not have the characteristics of a lease price. The fixed price **[*733]** that is mentioned in Article 1446 of the Civil Code means a price that can be enumerated or estimated according to whether it is in money or in kind.

"The price, as well as **[**10]** the sale, should be true and fixed, and consist of a given amount of money. When it is a matter of a thing or a transaction that gives fruits or other products, the rent may consist of an amount of the product, whether this amount is determined on an invariable basis, or whether it consists of a quota part of the products." Work of Maynz cited.

In this case, the price of the contract was enumerated in part by setting the sum of $100 per month, whether or [not] there was an extraction of stone. A partial amount was also added for each cubic meter depending on whether the production exceeded a certain limit. Clause 5 of the contract, *supra*. This addition certainly makes the perception of the price irregular, but rather it is a more or less *sui generis* modality that does not undermine the name that the parties have wanted to use to describe the contract and can coexist with the lease. "If we were asked," Scaevola states, "what was the legal nature of a contract in which one of the parties granted the use and enjoyment of a property he owns in exchange for receiving from the other party, one hundred *duros* in money, ten *almuds* of beans, fifty bushels of wheat and the right to utilization  **[**11]** of the grass of a field for the complete duration of the contract, we would answer without any type of scruples that it was a matter of a lease agreement." Scaevola, Volume 24, p. 404. Furthermore, it is not an element that makes the form of payment more complex or complicated. Knowing the number of meters extracted, the transaction cannot be simpler: it is a question of multiplication.

Likewise, it is neither serious nor significant reasoning that – just because the purpose that the property has to be devoted to is imposed on the lessee, without he and the lessor being able to engage in the same business at other sites – such condition affects the true concept of the lease. Article **[*734]** 1458, paragraph 2 already provides that the lessee is required to devote the thing to the use agreed upon, and the agreement between the parties that the lessee is required to devote the property to the sole purpose of extracting stone and that neither of them may engage in the same industry, is a legal stipulation that in no way varies the [scale] of the lease agreement.

There is also a matter of contention as to which can be the proper means for rescinding the agreement. The eviction complaint was dismissed because it was held **[**12]** that it was not a matter of a lease, and because supposing it were, it is alleged that the eviction complaint is not proper because it is a lease with complex elements. We have rebutted both of these things by analyzing the nature of the contract itself. We will add, however, as far as the reasons that may give rise to a rescission, that the precept of article 1459 does not limit or alter the eviction action when there is noncompliance with any of the conditions that give rise to said special action, and more so [if] it coexists with it. Said article states:

"Art. 1459. If the lessor or lessee do not comply with the obligations stated in the previous articles, they may ask for the rescission of the contract and indemnity for damages, or only the latter, leaving the contract in effect."

The law establishing the eviction proceeding, passed on March 9, 1905 (Comp. Sect. 1625), although it alludes to causes for eviction, was for the purpose of establishing the competency of the courts that were to hear the summary proceeding, but in reality the causes that are specified in Article 1472 of the Civil Code and that give rise to the eviction **[**13]** have remained in effect. This is a matter proper for the Civil Code as substantive law, while the action that is derived from it needs to be

regulated by eviction law, as procedural law. Manresa, as regards this detail, states:

**[*735]** "The power to terminate obligations is understood to be implicit in reciprocal obligations, in case one of the bound parties does not comply with what he is responsible for – according to Art. 1124 of the Civil Code, and through eviction the lease agreement is terminated or rescinded with a proceeding that is brief and proper for the nature of the matter." *Comentarios al Codigo Civil* [Comments on the Civil Code], Volume 10, p. 630.

The same author on page 545, 2nd edition of the same volume goes on to say:

"Likewise, it should be kept in mind that the precept of Article 1556 does not alter or limit the effectiveness of Art. 1569, that establishes just causes for the eviction and you cannot rationally raise any question whatsoever in the comparison of one article with the other, which may tend to undermine the eviction action that the lessor files against the lessee, in cases in which the law concretely authorizes it."

Article 1124, 1556 and 1569 as cited are reproduced in the Revised Civil Code **[**14]** under numbers 1091, 1459 and 1472 and they, respectively, state as follows:

"Art. 1091. The power to terminate obligations is understood to be implicit in reciprocal obligations, in case one of the bound parties does not comply with what he is responsible for."

****

"Art. 1459. If the lessor or lessee does not comply with the obligations stated in the previous articles, they may ask for the rescission of the contract and indemnity for damages, or only the latter, leaving the contract in effect."

"Art. 1472. The lessor may legally evict the lessee for any of the following causes:

"1. The term agreed upon or the one that is set for the duration of leases in Articles 1480 and 1484 has expired.

"2. Nonpayment of the price agreed upon.

"3. Violation of any of the conditions stipulated in the contract.

"4. Devoting the thing leased to uses or services not agreed to that deteriorates it; or not confining its use to what is ordered in number 2 of Article 1458."

The lessor, thus, is the one who can choose the proceeding for rescinding the lease **[*736]** agreement, either **[**15]** by using the summary process for eviction or the broader one of an ordinary trial. It does not matter that the defendant has invested the sum of $30,000 in his industry, which is given merit by the lower-court judge, in order to propel his business within the lease. This is merely incidental and should not impress the lower-court judge, and if the lessee breaches the contract in any way, the option of the remedy continues to exist for the lessor and the court has no power to substitute his right to an action once he has made his choice. The lower-court judge erred therefore by dismissing the eviction and not weighing the merits of the case.

*The judgment should be reversed and the case remanded for further proceedings that are not inconsistent with this opinion.*

Associate Justice Wolf did not take part in the resolution of this case.

_____

End of Document

**EXHIBIT E**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

MARIA IRAVEDRA
Plaintiff

v.

PUBLIC BUILDING AUTHORITY, ET AL
Defendants

CIVIL NO. 01-1581 (DRD)

---

## MOTION TO DISMISS AND BRIEF IN SUPPORT THEREOF

TO THE HONORABLE COURT:

**COME NOW** co-defendant The Commonwealth of Puerto Rico, through the undersigned attorney, and respectfully state and request as follows:

### STANDARD FOR MOTION TO DISMISS UNDER FED.R. CIV. PROC. 12 (b)(6)

Rule 12 (b)(6) provides that a defendant may, in response to an initial pleading, file a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-102(1957). The Court must accept as true the well-pleaded factual averments in the complaint, while at the same time drawing all reasonable inferences therefrom in the plaintiff's favor. See Correa Martínez v. Arrillaga-Beléndez, 903 F. 2d. 49, 51 (1st. Cir. 1990). Plaintiff must set forth in the Complaint "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." Gooley v. Mobil Oil Corp., 851 F. 2d. 513, 514 (1st. Cir. 1988). In §1983 claims, the complaint shall set forth minimal facts, not conclusions or "subjective characterizations, as to who did what to whom and why."

2

Dewey v. University of New Hampshire, 694 F. 2d. 1,3 (1st. Cir. 1982). cert. denied, 461 U.S. 944 (1983).

## FACTUAL BACKGROUND

According to plaintiff's allegations, this is an action grounded on Title VII and pursuant to §1983. Allegedly plaintiff was the Human Resources Director of the Public Building Authority ("PBA"). While occupying said position she was allegedly fired for national origins and sexual discrimination (gender and sexual harassment). It is also alleged that the "PBA" is a Public Corporation with power to sue and be sued. Plaintiff alleges that the "PBA" and the Commonwealth are employers under Title VII. Further, plaintiff states that **both**, the Commonwealth and the "PBA" are plaintiff's employers (complaint paragraphs 11, 12, 13). Under this set facts, with regard to the Commonwealth, we move the Court to dismiss the case grounded on the following reasons;

## THE "PBA" IS A CORPORATE ENTITY APART FROM THE COMMONWEALTH; THUS THE COMMONWEALTH IS NOT PLAINTIFF'S EMPLOYER AND SHOULD NOT BE A PARTY IN THE INSTANT CASE

The "PBA" was created by the Commonwealth's Law no. 56 of June 19, 1958 as amended, 22 L.P.R.A. §901 et seq. The nature of the "PBA" its clearly stated on its §902, see;

> § 902. Creation of the Authority
>
> A body **corporate** and politic with **corporate franchise** is hereby created and established, to be ruled by a Governing Board, whose members shall be appointed by the Governor of the Commonwealth with the advice and consent of the Senate, and shall bear the name of Public Buildings Authority. The Authority is hereby constituted as an instrumentality of the Commonwealth of Puerto Rico, exercising public and essential functions of the Government, and the execution of the powers conferred by §§ 901-917 of this title, by the Authority, shall be deemed as an essential function of the Government of the Commonwealth of Puerto Rico. –June 19, 1968, No. 56, p. 120, §1; July 2, 1991, No. 18, § 3. (emphasis supplied).

Although the Law states that the "PBA" is exercising public and essential functions of the Commonwealth, it has a corporate and politic body with corporate franchise. The powers of the "PBA" are all designed to bestow the administrative and fiscal independence that characterizes such corporate entities, among others see;

§ 906. Powers
The powers of the Authority shall be:
1. To have **perpetual existence as a corporation**.
2. To adopt, alter and use a corporate seal which shall be judicially noticed.
3. To have **complete control and supervision** over each and every one of its properties and activities, including the power to determine the nature and necessary of all expenses and the manner of incurring, authorizing and paying same; and to prescribe, adopt, amend and repeat rules and regulations for the conduct of its business in general, and to exercise and perform the powers and duties granted to and imposed on it by sections 901-917 of this title; Provided, That nothing contained in this subdivision shall be construed  as a limitation of the powers granted the *Controller* of Puerto Rico by the Constitution and the Laws.
4. **To sue and be sued**, complain and defend in all courts of justice and administrative bodies.
5. To make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers.
6. To acquire any kind of property and rights thereon in any lawful manner, including, without being limited to, the acquisition by purchase, either by agreement, or through the exercise of the power of eminent domain, lease, bequest, legacy or gift, and to possess, keep, lease, use and operate any venture or part thereof.

……..

9. To **appoint** such officers, agents and **employees** and vest them with such powers and impose on them on them such duties, and to fix, change and pay such compensation for their services, as the Authority may determine; but the provisions herein contained do not authorize the granting of salaries beyond the standards heretofore or hereafter established by the Legislature as to maximum salary level for services rendered to the Commonwealth of Puerto Rico.
10. To borrow money, make and issue bonds of the Authority for any of its

corporate purposes and to secure payment of its bonds and of any and all other obligations by pledge on all or any of its properties, revenues and incomes.

As we can see, the "PBA" appoints all her officers and employees, §906 (9) supra and has complete fiscal and administrative independence. Further, pursuant to the Law no. 58 the "PBA" can not pledge the Commonwealth's credit nor it will be liable for the PBA's debts, see;

16. To do all acts, or covenants, agreements, contracts or transactions necessary or convenient to carry out the powers granted to it hereby or by any other act of the Legislature of Puerto Rico, or by an act of the Congress of the United States; Provided, however, That the Authority **shall have no power** at any time or in any manner **to pledge the credit** or taxing power of the Commonwealth of Puerto Rico or any of its political subdivisions; **neither shall the Commonwealth** of Puerto Rico nor any of its political subdivisions **be liable for the payment** of the principal of or interest **on any bonds** issued by the Authority. (22 L.P.R.A. §906 (16), supra, emphasis supplied).

As stated, under the Law no. 58 supra, as a matter of Law, the fact is that the "PBA" is a public corporate entity apart from the Commonwealth with its own juridical persona. Therefore, although plaintiff erroneously states that the Commonwealth is her employer, for all legal purposes under a Title VII action, the "PBA" and not the Commonwealth, is plaintiff's employer. Pursuant to the mentioned fact, the Commonwealth should not be a party in this case and on those grounds, with regard to the Commonwealth we respectfully request this Court to dismiss the case.

**WHEREFORE**, for the reasons above stated, on behalf of the appearing defendant, we respectfully request to this Honorable Court to dismiss this instant case.

**I HEREBY CERTIFY**, that a true and exact copy of the this motion has been sent by regular mail to: **Victor P. Miranda-Corrada, Esq.,** Hato Rey Tower, Suite 1905, 268 Muñoz Rivera Ave., San Juan, P.R. 00918-2517, **Rafael Santos, Esq.,** Lespier, Muñoz & Noya Law Offices, PO Box 364428, San Juan, P.R. 00936-4428.

5

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this day 30th of July, 2001.

**ANABELLE RODRIGUEZ**
Secretary of Justice

**IVONNE PALERM**
Deputy Secretary for Litigation

**SALVADOR ANTONETTI-STUTTS**
**Director, Federal Litigation Division**

**JOSÉ SANTIAGO**
U.S.D.C.- 215610
Department of Justice
Federal Litigation Division
P.O. Box 9020192
San Juan, P.R., 00902-0192.
Tel. 721-5636, 721-2900, ext.2621

**EXHIBIT F**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| MARIA IRAVEDRA<br>Plaintiffs<br><br>Vs.<br><br>PUBLIC BUILDING AUTHORITY, ET AL<br>Defendants | Civil no. 01-1581 (DRD) |

## MOTION TO SUBMIT REPLY

**TO THE HONORABLE COURT:**

**COMES NOW,** codefendant the Commonwealth of Puerto Rico, through the undersigned Attorney, and respectfully state and requests as follows:

1. Dated on August 3, 2001 plaintiff filed an opposition to our Motion to dismiss. In the mentioned opposition, plaintiff states that although the "PBA" is a Public Corporation, it nevertheless is an "agent" of the Commonwealth and thus the Commonwealth as a person and an employer, is allegedly liable under this Title VII cause of action.

2. Through motion dated on August 9, 2001 and pursuant to Local Rule 311 (7), we requested and the Court granted leave to submit a Reply from plaintiff's opposition.

3. Through the present, we now request the Court to deny plaintiff opposition and with regard the Commonwealth dismiss the case for the following reasons;

4. We concede that the "PBA", as all other public corporate entities statutorily created by the Commonwealth, is created to performed some public or State function, it is at some degree controlled or audited by the Commonwealth

(appointment of its principal officers, etc.) and its personnel regulation must **conform** with the principles contained in the Commonwealth's Personnel Law (**but** are not directly regulated by the Commonwealth's Personnel Office). Nevertheless regarding the appointment of its employees for the purposes of a Tile VII action, the "PBA" is completely independent from the Commonwealth. The "PBA" hired, appointed and dismissed plaintiff from her job, thus is the sole employer under the Law.

5. In support of his opposition to our motion to dismiss, plaintiff further states;

    a. "The Commonwealth is included within the entities that can be employer under Title VII definitions". Granted, but the inclusion under the definitions of employer, do not by any means resolves the issue of who is in fact and as matter of Law, plaintiff's employer.

    b. "The "PBA" is an agent of the Commonwealth". For the purpose of implementing the public programs and services for it was created, for arguments sake, we can accept plaintiff's asseveration. But that theory does not changes the fact of the corporate nature of the "PBA", its power to hire and appoint its own employees, its existence as an independent juridical persona, its fiscal and administrative independence and that its obligations will not tax the Commonwealth's credit (please see our motion to dismiss).

    c. "The Commonwealth **may** guarantee the bonds issues by the "PBA", 22 LPRA §907a". Such turn of phrase clearly also implies that **it may not.** That the Commonwealth **may** extend the mentioned guarantee, clearly shows the discretionary nature of such decision and thus, to third parties, under the cited disposition, the Commonwealth has no obligation for "PBA's debts or liabilities.

    d. The "PBA" is exempted from payment of taxes, 22 LPRA §909". If the Commonwealth exempts the PBA from paying taxes, what clearly shows is that it is an entity apart and distinct from the Commonwealth itself. Otherwise it would not need to be exempted.

e. "The members of the "PBA" Board of Directors is appointed by the
Commonwealth's Governor with the approval and consent of the
Senate ...". Granted, still this fact dos not changes the "PBA's nature,
see paragraph b, supra.

f. Defendant Wilfredo Jirau, former "PBA's Executive Director, is entitle to
the qualified immunity defense ...". Granted, defendant Jirau **in his
personal capacity,** pursuant to Commonwealth's Law no. 104 of
June 29, 1955, as amended, is entitled to the qualified immunity
defense. But precisely to show plaintiff's theory weakness, for the
"PBA's nature as a corporate entity distinct and apart from the
Commonwealth, **neither the "PBA" nor defendant Jirau in his
official capacity,** are entitle to the Commonwealth's 11th amendment
immunity defense, Pennhurst State School & Hospital v. Halderman,
465 U.S. 89 (1984); Employees v. Missouri Public Health & Welfare
Dept., 93 S. Ct. 1614 (1973); Edelman v. Jordan, 415 U.S. 651
(1974); Kentucky v. Graham, 473 U.S. 159 (1985); Ford Motor
Company v. Dept. of Treasury of Indiana, 323 U.S. 459 (1945),
Ramírez v. P.R. Fire Service, 715 F. 2d. 694, 697 (1st. Cir. 1983),
Ainsworth Aristocrat Int'l Pty. Ltd. v. Tourism Co. of Puerto Rico, 818
F. 2d. 1034 (1st. Cir. 1987) quoting Mount Healthy City School District
Bd. of Education v. Doyle, 429 U.S. 274 (1977), Culebras Enterprises
Corp. v. Rivera Ríos, 838 F.2d 506 (1987), Ursulich v. Puerto Rico
National Guard, 384 F.Supp. 736, 737-738 (D.P.R. 1974), Will v.
Michigan Department State Police, 109 S. Ct. 2304, 2311 (1989), Hafer
v. Melo, (1991) 502 U.S. 21.

6. Over the issue whether a Public Corporation is or not a "Arm or *alter ego* of
the State" for purpose of the 11t amendment defense, in Riefkohl v. Alvarado
749 F. Supp. 374 (D. Puerto Rico 1990), grounded on the characteristics of
another Public Corporation with **similar if not identical characteristics** to

the "PBA", the Puerto Rico Electric Power Authority (PREPA), the Court stated;

> "In its prior judgment, the Court held that PREPA had expressly waived its sovereign immunity from suit in federal court. Citing the PREPA Act, the Court noted that the Authority was empowered to "sue or be sued… in all courts". 22 L.P.R.A. sec. 196(e). Defendants now assert that this language does not specifically indicate PREPA's willingness to be sued in federal court and therefore argue it is insufficient to waive defendants' sovereign immunity. While there is some support for defendants' position that a statute empowering an agency to be sued "in all courts" does not necessarily waive the defense of the eleventh amendment, *see Patsy v. Board of Regents of the State of Florida,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (Powell, J., dissenting), the Court nevertheless reaffirms its initial holding that the PREPA consent to suit statute does indeed allow for suit in federal court.
>
> In determining whether a State has waived its eleventh amendment immunity courts must look to whether the statute specifies "the State's intention to subject itself to suit in *federal court". Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985) (emphasis in original). A waiver must be stated "'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction'". *Id.* at 239-240, 105 S.Ct. at 3146 (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974)(internal quotation omitted)). At first blush it would seem that a consent to sue and be sued "in all courts" unequivocally includes federal courts. Yet, in light of the strict requirements articulated by the Supreme Court, there is room to argue that, on its face, such a statute is ambiguous. **An examination of the text of the PREPA Act, however, reveals that PREPA is not an "arm" of the**

**Commonwealth of Puerto Rico and is therefore not entitled to eleventh amendment protection**.

[1,2] The **relevant factors** to be taken into account when deciding whether to apply the doctrine of sovereign immunity to a governmental agency are **whether the agency is financially autonomous, whether it functions independent of the State, whether it serves a public purpose and perhaps most importantly, whether a judgment against the agency will be satisfied from its own funds**. *See Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506 (1st Cir. 1987); *Anaya Serbia v. Lausell*, 646 F. Supp. 1236 (D.P.R. 1986). Applying these criteria, the Court concludes that PREPA is a public corporation with sufficient fiscal autonomy such that it cannot be considered an alter ego of the Commonwealth for eleventh amendment purposes.

That PREPA has at its core a public objective cannot be denied. It exists ultimately in order to "promote the general welfare and increase and prosperity". 22 L.P.R.A. §196. **Yet while it was created as a "public corporation and [a] governmental instrumentality... it is a corporation having legal existence and personality separate and apart from that of the Government**". 22 L.P.R.A. §193. PREPA has the **power to "issue its own bonds" and "enter into contracts**... [with] the Commonwealth of Puerto Rico". 22 L.P.R.A. §§206(a), 196(p). Further evidence of PREPA's unique provence over its own affairs can be gleaned from the following discussion of its general power:

> [PREPA shall] have **complete control and supervision** of any undertaking acquired by it including the power to determine the character of and the necessity for all its expenditures and the manner in which they shall be incurred, allowed and paid without regard to the provisions of any laws governing the expenditure of public funds.

22 L.P.R.A. §196(d).

The **fiscal autonomy** of PREPA is emphasized throughout the statute. For example, section 202 states that "[a]ll moneys of the Authority... shall be kept in separate accounts" and section 196(s) states that the Authority "**shall have no power at any time or in any manner to pledge the credit or taxing power of the Commonwealth**..." 22 L.P.R.A. §§202, 196(e). Moreover, section 196(*l*) gives PREPA the power to "determine, fix, alter, charge, and collect reasonable rates". 22 L.P.R.A. §196(l).

While not controlling by itself the financial independence of PREPA – and more specifically the source of funds – is highly relevant because "'**if the funds [to satisfy a judgment] must come from the Commonwealth treasury, the Commonwealth will have more than a passing interest in the litigation**'". *Anaya Serbia, supra, 646 F.Supp. at 1241 (*quoting *Canadian Transport Co. v. Puerto Rico Ports Authority,* 333 F.Supp. 1295, 1297 (D.P.R. 1971)). On this point the statute creating PREPA is clear. It expressly states that the "**debts, obligations, contracts, bonds, notes... and property of the Authority, its officers, agents, or employees shall be deemed to be those of said government-controlled corporation and not to be those of the Commonwealth Government**". 22 L.P.R.A. §193(b). A later section reiterates that neither bonds nor other obligations "shall... be payable out of any funds other than those of the Authority". 22 L.P.R.A. §210.

PREPA's **fiscal autonomy** together with its **power to administer its own affairs** leads this Court to reaffirm its earlier holding that PREPA **is not an alter ego of the Commonwealth, but is rather a governmental agency with its own distinct identity**. As such, PREPA is not immune from suit in federal court. This conclusion is in accord with the First Circuit, which has characterized PREPA

as a "quasi-public corporation" and has implicitly acknowledged that PREPA can be sued in federal court. *See Rodriguez-Burgos v. Electric Energy Authority,* 853 F.2d 31, 35 n. 5 (1st Cir. 1988)". (emphasis supplied).

8. As we stated and showed in our Motion to Dismiss, under its organic Law, the "PBA" has all the characteristics of a Public Corporation distinct and apart from the Commonwealth. For this reason it cannot be seriously contended that the "PBA" is **not** an " arm or *alter ego"* of the Commonwealth to which the 11th immunity extends. The same can be said of defendant Jirau in his **official capacity**.

9. For arguments sake, if the "PBA" would be an "arm or *alter ego*" of the Commonwealth as plaintiff proposes, the inverse would be true. The "PBA" would be invested with the 11th Amendment Immunity and thus with regard to the Agency and defendant Jirau in its official capacity, on those grounds we could request the dismissal of the case.

10. In sum, for the purpose of this claim, the "PBA" is whom hired, appointed and fired plaintiff, the Commonwealth does not assumes responsibility nor is liable for the personnel decisions executed by the "PBA" (or any other internal administrative decision).

**WHEREFORE,** on behalf of here appearing defendant, for the reasons stated, we respectfully request to this Honorable Court, to dismiss the case, the Commonwealth as a matter of fact and of Law is not plaintiff's employer under this Title VII action.

**I HERE BY CERTIFY,** that on this date a true and exact copy of this document has been sent by regular mail to: **Victor P. Miranda-Corrada**, **Esq.,** Hato Rey Tower, Suite 1905, 268 Muñoz Rivera Ave., San Juan, P.R. 00918-2517, **Roberto A. Fernandez, Esq.,** Lespier, Muñoz & Noya Law Offices, PO Box 364428, San Juan, P.R. 00936-4428.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this day 28th of September, 2001.

**ANABELLE RODRIGUEZ**
Secretary of Justice

**IVONNE PALERM**
Deputy Secretary for Litigation

**SALVADOR ANTONETTI-STUTTS**
Director, Federal Litigation Division

**JOSÉ SANTIAGO**
U.S.D.C.- 215610
Department of Justice
Federal Litigation Division
P.O. Box 9020192
San Juan, P.R., 00902-0192.
Tel. 721-5636, 721-2900, ext.2621